172 So. 649

## WHITE v. BIRMINGHAM POST CO.

### 6 Div. 966.

Supreme Court of Alabama.

Jan. 7, 1937.

Rehearing Denied March 4, 1937.

Clark & Trawick, of Birmingham, for appellant.

Leader, Hill, Tenenbaum & Seedman, of Birmingham, for appellee.

548

**KNIGHT, Justice.**

Action to recover damages for an alleged libel brought by the appellant against the appellee.

From adverse rulings by the trial court, in sustaining the demurrers of the defendant to the several counts of the complaint, the plaintiff suffered a nonsuit. On this appeal on the record, he presents for review here the rulings of the court in sustaining the demurrers to the several counts of the complaint.

The publication complained of, and which appeared in the Birmingham Post, in its issue of July 13, 1935, is as follows:

"Arabian Sheik Asks Friend Here to Buy Him an American Girl for Harem.

"Roebuck man urged to look for 'Chief Wife' in Birmingham.

"The pleasure, privilege and honor of being chief-wife in an Arab sheik's harem awaits some Birmingham or Alabama maiden, it was revealed today.

"The Hon. Fareed J. Iman, member of an old aristocratic Arabian family, has asked a friend in Birmingham to find him a wife. And the lucky girl would be chief-wife in his four-wife harem.

"Sheik Iman's American friend is Lytle White of Roebuck, who made the Arabian's acquaintance, while touring in Asia-Minor in the summer of 1930.

"Mr. White spent two weeks in the home of the Arabian in Jerusalem and also visited with the latter's relatives. Ever since that time the two have corresponded regularly.

"In a recent letter, Mr. Iman, who is 29 years old and fears he may reach 30 before he obtains a chief-wife to his taste, has asked his Birmingham friend to help him out. And in accordance with Arabian customs, he is ready to purchase a suitable girl from her parents.

"Arab sheiks feel, explained Mr. White, who has made a study of Arabian customs, that they must obtain a wife by the time they become 30 years of age or they won't visit them. And not to have visitors would be the greatest affront to Arabian hospitality, he explains.

"Mr. Iman, according to Mr. White, is the descendant of an influential line of Arab rulers. A relative is the present mayor of Jerusalem.

"Describing his Arab friend, Mr. White says, 'he is a man of unusual personal charm, is cultured and has advanced beyond his people in moral and aesthetic living. He is Orthodox Moslem, believing in a harem of four wives, as provided by Moslem law.'

"Sheik Iman hopes to obtain a 'beautiful and competent' wife in America. As his chief wife, she will supervise his harem and household and will raise 'many marketable daughters and hearty sons.'

"She will have the benefit of the traditional Arabian protective treatment of women but she can't be seen by those who are not members of her household, being required to wear a veil when outside.

"Sheik Iman is by the occupation an archaeologist and tourist contractor, Mr. White said. He is opposed to all intoxicants and tobacco because 'he cannot afford to defile his body which to him is a divine instrument.' He speaks correct English but with an Oriental accent, Mr. White said, having been educated in an American school near his home.

"Besides Mr. Iman's occupation, he is greatly interested in astrology and geology.

"And although Mr. White will not take the responsibility of selecting Sheik Iman's 'Chief Wife,' he will be glad to make con-

tact with the Arabian for those interested. Mr. White can be reached by telephone at 9–1817 or by mail at Roebuck Springs.

"Is there a Birmingham miss, 'Beautiful and competent,' who would like a life time job in foreign service? Sheik Fareed J. Iman, 29 years old Arabian aristocrat and archaeologist living in Jerusalem, is looking for just such young American woman to head his harem as 'Chief-Wife,' he has notified his friend, Lytle White of Birmingham."

When the suit was filed, the complaint consisted of one count, but thereafter a number of others counts were added, each predicated upon the publication set out above. In some of the counts the plaintiff, by use of an innuendo, undertook to explain the published words, and to show that, with such meaning given to 'them as set out in the innuendo, they constituted a libel upon him.

The court sustained demurrers to the original count, and to each of the added counts. The plaintiff then undertook to add still another count, lettered "H. H.," but the court declined to permit him to add this count, taking the position, as shown in the minute entry, "that no cause of action could be sufficiently stated based upon the alleged libel, and not already stated in previous counts to which demurrers have been sustained, and that further amendments would only further delay the trial of the cause."

If the publication in question was in fact libelous, the court committed error in sustaining the defendant's demurrers.

In 17 Ruling Case Law, p. 286, § 26, the rule on this subject is expressed by the author in the following language: "It is well settled that, to constitute libel, it is not necessary that written statements should contain an imputation of an offense that may be punished as a crime. It is sufficient if the language tends to injure the reputation of the party, or to throw *contumely* or to *reflect shame* or *disgrace* upon him. As a general rule written words exposing the person to whom they refer to *hatred,* ridicule, contempt, shame or disgrace are libelous per se. (Italics supplied.)

The above rule has received the full approval of this court, as appears from the case of Iron Age Publishing Co. v. Crudup, 85 Ala. 519, 520, 5 So. 332, 333, where we find the following observation is made:

"The definitions of 'libel,' as found in the cases, vary somewhat in phraseology, and are more or less comprehensive, as may be called for by the particular charge involved in the case. Generally, any false and malicious publication, when expressed in printing or writing, or by signs or pictures, is a libel, which charges an offense punishable by indictment, or which tends to bring an individual into public hatred, contempt, or ridicule, or charges an act odious and disgraceful in society. This general definition may be said *to include whatever tends to injure the character* of an individual; blacken his reputation, or imputes fraud, dishonesty, or other moral turpitude, *or reflects shame, or tends to put him without the pale of social* intercourse." (Italics supplied.)

This same definition of "libel" was more recently reannounced in the cases of Fitzpatrick v. Age-Herald Publishing Co., 184 Ala. 510, 63 So. 980, 51 L.R.A.(N.S.) 401, Ann.Cas.1916E, 753, and Marion v. Davis, 217 Ala. 16, 114 So. 357, 358, 55 A.L.R. 171.

In the case of Marion v. Davis, supra this court, in an exhaustive opinion by Mr. Justice Brown, said:

"The right to the enjoyment of a private reputation, unassailed by malicious slander, is of ancient origin, and is necessary to human society. A good reputation is an element of personal security, and is protected by the Constitution equally with the right to the enjoyment of life, liberty, and property. Constitution of 1901, § 13; Newell's Slander & Libel (3d Ed.) §§ 1, 26; 36 C.J. 1148, § 11. * * *

"In cases of libel, if the language used exposes the plaintiff to *public ridicule or contempt,* though it does not embody an accusation of crime, the law presumes damage to the reputation, and pronounces it actionable per se. * * *

"In determining their actionable character, they [words printed] are to be taken in their natural meaning, and according to the sense in which they appear to have been used and the idea they are adapted to convey to those who heard them. A forced construction is not to be put upon them in order to relieve the defendant from liability. Downing v. Wilson, 36 Ala. 717; Berry v. City of New York Ins. Co., 210 Ala. 369, 98 So. 290; Waters v. Jones, 3 Port. 442, 29 Am.Dec. 261; Phillips v. Bradshaw, 167 Ala. 199, 52 So. 662; John-

**550**

son v. Turner; ·159 Ala. 356, 47 So. 570; Labor Review Pub. Co. v. Galliher, 153 Ala. 364, 45 So. 188, 15 Ann.Cas. 674; 36 C.J. 1155, § 21; 17 R.C.L. 312, 313, §§ 53, 54." (Italics supplied.)

■ The publication is not to be measured by its effect when subjected to the critical analysis of a trained legal mind, but must be construed and determined by its natural and probable effect upon the mind of the average lay reader. Becker v. Brinkop (Mo.App.) 78 S.W.(2d) 538.

■ The published words may be actionable in themselves, or per se; or they may be actionable only on allegation and proof of special damage or per quod. But words of both classes are actionable on the same grounds and for the same reasons. The injurious quality in both classes "lies in the fact that they are the natural and proximate causes of damage to those concerning whom they are maliciously uttered." Words libelous per se import damage, while words actionable only per quod are those whose injurious effect must be established by allegation and proof.

With these statements of law governing the case, we will now consider the language of the offending publication, to determine whether or not it was of such character as to make it libelous per se, or libelous per quod.

■ The caption of the article in question, "Arabian Sheik asks Friend here to buy him an American Girl." We take the following from this publication:

"Roebuck man urged to look·for 'Chief Wife,' in Birmingham.

"The pleasure, privilege and honor of being chief-wife in an Arab sheik's harem awaits some Birmingham or Alabama maiden, it was revealed today.

"The Hon. Fareed J. Iman, member of an old artistocratic arabian family, has asked a friend in Birmingham to find him a wife. And the lucky girl would be chief-wife in his four wife harem.

"Sheik Iman's American friend is Lytle White of Roebuck, who made the Arabian's acquaintance, while touring in Asia-Minor in the summer of 1930.

"Mr. White spent two weeks in the home of the Arabian in Jerusalem and also visited with the latter's relatives. Ever since that time the two have corresponded regularly.

"In a recent letter, Mr. Iman, who is 29 years old and fears he may reach 30 before he obtains a chief-wife to his taste, has asked his Birmingham friend to help him out. And in accordance with Arabian customs, he is ready to purchase a suitable girl from her parents. * * *

"Describing his Arab friend, Mr. White says, 'he is a man of unusual personal charm, is cultured and has advanced beyond his people in moral and aesthetic living. He is Orthodox Moslem, believing in a harem of four wives, as provided by Moslem law.'

"Sheik Iman hopes to obtain a 'beautiful and competent' wife in America. As his chief wife, she will supervise his harem and household and will raise 'many marketable daughters and hearty sons.' * * *

"And although Mr. White will not take the responsibility of selecting Sheik Iman's 'Chief Wife,' he will be glad to make contact with the Arabian for those interested. Mr. White can be reached by telephone at 9–1817 or by mail at Roebuck Springs."

The plain import of this published statement was: That a certain named Arab wanted an American woman to be his chief wife in his harem in some far-off country; that the Arabian was ready to purchase from her parents a suitable girl for his chief wife; that the Arab's harem, to be complete, must contain four wives; that Mr. White, the plaintiff, was friend of this Arab, had visited in his home in Jerusalem, and held himself out as being ready and willing to make contact with this Arabian with any one who might be interested in accepting his offer to become one of his wives.

The very idea of a harem is repulsive to our American conception of morality and virtue. The purchase of a girl from her parents here in America, to be carried to some distant country, to complete an Arab's harem of four wives, is abhorrent to our American institutions and our conceptions of morality. And to falsely and maliciously publish to the world that one stood ready to aid and abet in the consummation of such a scheme is nothing short of a libel actionable per se. We are of the opinion that the published statement, if falsely and maliciously made, was a libel per se on the plaintiff, and that the several counts of the complaint were not subject to any grounds of demurrer assigned thereto.

■ There was no necessity for any innuendo. Therefore, the innuendo, wheth-

er warranted or not, could be treated as surplusage, and did not render the complaint demurrable, since it charged a libel actionable per se. Choctaw Coal & Mining Co. v. Lillich, 204 Ala. 533, 86 So. 383, 11 A.L.R. 1014.

It follows, therefore, that the nonsuit will be here set aside, and the demurrers to the several counts of the complaint overruled, and the cause remanded for new trial in conformity to this opinion.

Reversed, rendered, and remanded.

ANDERSON, C. J., and THOMAS and BROWN, JJ., concur.