### HOUSTON PRINTING CO. v. HUNTER.*
#### No. 13487.

Court of Civil Appeals of Texas. Fort Worth.

Jan. 29, 1937.

Rehearing Denied May 7, 1937.

*Judgment affirmed 106 S.W.(2d) 1043.

J. T. Montgomery, of Wichita Falls, and Walter F. Woodul, of Houston, for appellant.

Taylor, Muse & Taylor and Bruce Greenwood, all of Wichita Falls, and Fuller & Fuller, of Houston, for appellee.

SPEER, Justice.

Plaintiff, Tom F. Hunter, sued defend-ant, Houston Printing Company, in the district court of Wichita county for libel growing out of three articles published by the defendant in the Houston Post on August 22, 23, and 24, 1934.

For convenience, we shall refer to the parties as plaintiff and defendant, as they appeared in the trial court.

Plaintiff alleged that prior to and during the time the alleged libelous publications were being printed and circulated, he was a candidate for Governor before the Democratic Primaries in Texas; that the second or run-off primary in this state was held on August 25, 1934; that the defendant, through its agents authorized to so act, wrote, printed, published, and cir-culated through the state three certain articles captioned "Dangerous Experiment," "The State Races," and "Do We Want a Revolution?" That the articles appeared in the Houston Post in the order named on said August 22, 23, and 24, 1934, respective-ly. We think it proper to quote the first two articles, but will omit the third, since, under the verdict of the jury, it went out of the case and no complaint is made to the action of the jury in this respect. We shall hereafter refer to the articles by the heading or caption given each.

"Dangerous Experiment" was published on August 22, 1934, and reads as follows:

"A Government experiment is dangerous at any time and doubly so when a mistake would mean disaster.

"Since reconstruction days, Texas has indulged in but one experiment in select-ing a Governor. That was when James E. Ferguson was elected for the first time. All other Governors were elevated to that high position after serving in some capacity in the public service.

"The people are familiar with the results of the Ferguson experiment. The election in that instance of a newcomer to public life kept Texas in bitter turmoil for near-ly twenty years.

"Today the state faces a critical period in its history. Grave economic problems confront its people. A shattered economic structure must be rebuilt and other mo-mentous problems cry out for solution.

"The welfare of Texas for at least two decades depends upon the manner in which these problems are approached. If they are handled wisely, Texas will prosper. If we experiment and make a mistake, it will prove extremely costly, perhaps tragic.

"Tom F. Hunter entered the Governor's race in 1932 with no previous public ex-perience. His entire career has been in the role of a candidate for office. If he is a student of government, his speeches indicate he has gained little from his studies and research.

"He comes before the people with pro-posals that are fantastic and impractical. At a time when we must build, he would tear down. He dangles before the voters a 'blended tax,' which he describes as a panacea for all our ills, but which in reali-ty would fasten upon the hard pressed producers an even greater burden of taxa-tion. He proposes a dictatorship, with the Governor presiding over an appointive cabinet composed of officials now selected by vote of the people as provided in the Constitution.

"He would not approve the existing form of government, but would remake it after his own pattern. He wants to ex-

periment with the whole state of Texas as his laboratory and its government as his test tube.

"Attorney General James V. Allred has demonstrated his capacity for sound leadership in an important office. He has recovered millions for the school children of the State and added valuable oil lands to their heritage. As attorney general for two terms, he has dealt with problems of state and obtained an inside knowledge of the workings of government.

"With this background of experience, he stands on a platform of constructive proposals, to be carried out within the framework of the existing form of government, the form of government prescribed by the constitution and under which this state has achieved greatness.

"He wants to reform but not to destroy, to blend or to experiment.

"His official record is the people's guarantee that he is a worker and a builder, not a wrecker.

"The six million people of Texas are too sensible to cast off into dangerous and unknown waters in Tom Hunter's experimental ship of state."

"The State Races" was published on August 23, 1934, and reads as follows:

"The voters must fill five important offices in their state government on Saturday. Upon their wisdom in casting their ballots depends the kind of leadership this state will have during the next two years, and, in a measure, the kind of conditions under which 6,000,000 people will live.

"The voters have an opportunity to cast aside certain influences that have been harmful in the past. They have an opportunity with their votes to turn their faces toward a new and progressive era in government.

"In the governor's race, the issue is clear, the people either can elect Attorney General James V. Allred or vote for a continuation of the old political alignments, made more serious in this instance because their champion is also a visionary and a dreamer who would wreck the very form of government prescribed by the constitution.

"James V. Allred is a known quantity. His past record is one of progress and a guarantee that he is in earnest when he presents his platform of progress for the future. His opponent is an unknown quantity, whose entire public record was com-

piled as a candidate for office. That record, such as it is, is destructive, and dangerous, and it is made doubly threatening by the support it has attached.

"The Post is confident the people will reject the dangerous theories that have been dangled before their eyes in the guise of a panacea for all their ills and vote for progress by electing James V. Allred as their Chief Executive."

Plaintiff alleged, in appropriate form, his character and reputation throughout the state prior to the alleged libelous publications, and that upon entering the race for Governor in the early part of 1934 he caused to be printed and circulated many thousand copies of his platform, containing what he termed questions confronting the people of the state and his committals and remedies for those things which were of an economic nature. That defendant well knew from said printed matter the views of plaintiff on all such questions.

Allegation was made that defendant, with full knowledge of the contents of plaintiff's said platform, and cognizant of what plaintiff had said in many public addresses throughout the state with reference thereto, "but with actual malice toward this plaintiff, contrived wickedly and maliciously to injure this plaintiff and deprive him of his good name, fame, character, reputation and popularity with the people and citizens of Texas, as well as to destroy plaintiff's opportunity of becoming Governor of Texas, and to bring plaintiff into public scandal, infamy and disgrace, and to expose this plaintiff to public hatred, contempt and ridicule, by falsely, wickedly and maliciously composing, writing, publishing and circulating" the above-quoted articles on the dates named.

Plaintiff averred that by the article headed "Dangerous Experiment" he was "maliciously libeled" by defendant, and particularly that part thereof which reads: "He proposes a dictatorship, with the Governor presiding over an appointive cabinet composed of officials now selected by vote of the people, as provided in the Constitution.

"He would not approve the existing form of government but would remake it, after his own pattern."

In connection with this article, the plaintiff further charged that the language used by defendant was "employed, used and expressed in the sense and meaning of one opposed to a Republican form of govern-

ment, and one who would appropriate unto himself arbitrary, unconstitutional and unlawful and dictatorial powers in violation of the Constitution of the United States of America. * * * That the defendant herein in the use, sense and meaning of the said malicious libels imputed to this plaintiff corrupt, evil, unlawful and reprehensible motives and purposes in seeking to be elected Governor of the State of Texas."

It was alleged that the article headed "The State Races" was libelous and particularly in paragraph three thereof, wherein it is said "* * * their champion is also a visionary and a dreamer who would wreck the very form of government prescribed by the Constitution," and that said statement referred to and meant the plaintiff. That the word "wreck" as employed by defendant was used by defendant in its ordinary sense and meaning, that is, to destroy, to disorganize, to ruin, to tear down, especially by violence.

Following certain allegations concerning the third article, omitted by us for the reasons given, the allegation is made: "Plaintiff would further represent to the court that he has been libeled by defendant herein in that defendant did with actual malice toward this plaintiff libel this plaintiff in deliberately, wickedly and maliciously composing, printing, publishing and circulating the three editorials," naming each of the articles as we have done above, and especially in those parts above pointed out.

Plaintiff claimed that because of the acts of defendant he had been exposed to hatred, contempt, ridicule, and personal embarrassment, humiliation, and chagrin, and that his honesty, integrity, and reputation had been maligned and slandered and that he had suffered actual damages in the sum of $50,000 to his good name, fame, character, reputation, and political career, by reason of having been wrongfully exposed to said public hatred, humiliation, contempt, and ridicule; that on account thereof he had suffered pain in body and mind to his damages in said amount.

Plaintiff prayed for special damages in the sum of $50,000, because of injuries sustained on account of defendant's alleged wrongful acts, to "his political, civic, patriotic and business career." Prayer also was for $50,000 as exemplary damages.

Defendant answered with a general demurrer and special exceptions to practically all parts of the petition which charged defendant with wrong in connection with the published articles. It further answered with a general denial and by special pleas, to the effect that the articles complained of were published by defendant as a newspaper in the regular and orderly manner of placing before its readers matters of public interest and concern, and that each and all of said articles and the contents of each are and were privileged under article 5432, Rev.Civ. Statutes of the state. That said article constituted reasonable and fair comment and criticism with respect to plaintiff's platform upon which he was offering himself as a candidate for Governor of the state of Texas. That said articles were published by the defendant at a time and under such circumstances that they became matters of public concern and were published by it as a matter of general information, and were privileged to it as the publisher of said newspaper, and for which plaintiff could maintain no action such as instituted by him herein.

Further answer was made that, if any part of either of said articles contained what purported to be statements of facts, "which is strenuously denied, then the defendant alleges that any such statement of facts, if any there be therein, is true, or, in the alternative, if it be found that any statement of facts was not true, then this defendant avers and charges that such statements were made in good faith and in the honest belief of the truth of each of such statements and averments, and was published and circulated in the honest belief of the truth of same, and that this defendant has just and reasonable grounds and proper cause for maintaining such belief and for making the publication, statement, averments and comments therein contained, which were made for general information of the public and were justified by the occasion and circumstances."

Further answer was made denying that either of said articles was susceptible to the construction placed thereon by plaintiff, and that the innuendos and allegations made by plaintiff as to the meaning to be placed thereon were not warranted or justified by the language used therein.

The answer refers at length to certain provisions of plaintiff's political platform upon which he was seeking the nomination to the office of Governor, which, if adopted, would materially change the form of Constitutional government under which the state has long operated, and that the change proposed by plaintiff was of vital interest to

the public, in that such change would place great power and control of the affairs of state in the Governor and that, in the opinion of many, would give to the Governor dictatorial powers. That said articles consisted of a fair and reasonable comment and criticism of the proposed changes in state affairs to be effected, should plaintiff become Governor of Texas and the plans of his platform be adopted.

Special denial was made that malice, hatred toward plaintiff, or other improper motive prompted defendant to cause said articles to be published and circulated, but the sole purpose was, as alleged, to give a fair and reasonable comment and criticism of plaintiff's proposals through his platform and public addresses, and for the general information of the interested public.

The general demurrer and all the special exceptions urged by defendant were overruled, to which exceptions were taken.

The case was tried to a jury on special issues, resulting in a verdict for plaintiff for $5,000 actual and $10,000 exemplary damages. Judgment was rendered upon this verdict, and defendant has perfected this appeal.

Article 5430, Rev.Civ.Statutes, which is our statute on libel, reads:

"A libel is a defamation expressed in printing or writing, or by signs and pictures, or drawings tending to blacken the memory of the dead, or tending to injure the reputation of one who is alive, and thereby expose him to public hatred, contempt or ridicule, or financial injury, or to impeach the honesty, integrity, or virtue, or reputation of any one, or to publish the natural defects of any one and thereby expose such person to public hatred, ridicule, or financial injury."

For many years our laws have provided for exceptions to the above rule, which exceptions have been designated as privileged statements when made between persons bearing certain relations to each other. In late years there has been a very just recognition of the beneficent influence possessed by newspapers over our people. As time has passed, means have been perfected by which our better papers have been enabled to quickly and accurately place before its readers all matters of public concern, and readers have learned to rely upon their favorite publication to keep them posted on public affairs. This condition has brought about a public necessity to permit newspapers and periodicals to speak frankly yet fairly in all matters when published for general information of their reading public. As early as 1919, article 5432, Rev.Civ.Statutes, has provided with reference to such privileged statements as follows:

"The publication of the following matters by any newspaper or periodical, shall be deemed privileged, and shall not be made the basis of any action for libel without proof of actual malice. (This provision was amended in 1927, by the 40th Legislature [Vernon's Ann.Civ.St. art. 5432] by omitting the words without proof of actual malice.) * * *

"4. A reasonable and fair comment or criticism of the official acts of public officials and of other matters of public concern published for general information."

These statutes have been designed to cover the whole field of libel under the laws of this state and have removed the necessity of looking to the principles of common law in such cases. Blum v. Kusenberger (Tex. Civ.App.) 158 S.W. 779; Walker v. Light Pub. Co., 30 Tex.Civ.App. 165, 70 S.W. 555; Morrison v. Dean (Tex.Civ.App.) 104 S.W. 505.

■ Defendant assigns as error the action of the court in refusing to sustain its general demurrer to plaintiff's petition upon the grounds that the alleged libelous articles published by it are, as a matter of fact, as well as of law, fair and reasonable comments and criticisms of plaintiff and his political platform upon which he sought the nomination for the office of Governor, and were matters of public concern published by it for general information. As we understand the law as laid down by our courts in such cases, if the alleged libelous matter is such that its language is obvious, unambiguous, and evident, and not capable of a defamatory meaning, it would be the duty of the court to so declare it; and, if such allegations were relied upon by one seeking damages for its publication, it would be the duty of the court to sustain a general demurrer thereto.

It was said in this connection in the case of Culmer v. Canby (C.C.A.) 101 F. 195, 196: "Before a demurrer can be sustained to a petition counting on an alleged libelous publication, it must appear that the publication is not reasonably capable of a defamatory meaning, and cannot reasonably be understood in a defamatory sense."

The rule is laid down in Southern Publishing Co. v. Foster (Tex.Com.App.) 53 S.W.(2d) 1014, 1016, in this language:

"The rule is established that, when the language used in the publication is ambiguous so that extrinsic evidence is needed to determine its character as to its being actionable or not actionable, if a jury is demanded to try the cause, it is the duty of the court to submit to the jury, under proper instructions, the issue as to whether or not the language used is libelous. If the publication standing alone is clearly libelous, it is the duty of the court to instruct the jury accordingly," citing Cotulla v. Kerr, 74 Tex. 89, 11 S.W. 1058, 15 Am.St.Rep. 819; Guisti v. Galveston Tribune, 105 Tex. 497, 150 S.W. 874, 152 S.W. 167.

' The plaintiff was a candidate for Governor of Texas and had formulated and caused to be distributed throughout the state what he called his "platform" or those things in state affairs which needed correction and gave his plan to remedy them. Among other things, plaintiff's platform provided:

"There shall be created a board of Public Relations or Governor's cabinet, consisting of five to seven members. The act of creation shall provide for the abolition of all statutory-created boards, commissions and bureaus, and by resolution for constitutional amendments provide for the abolition of elective officers as recommended by the Legislative Committee on re-organization and economy in its report to the Forty-Third Legislature. We shall abolish more than a hundred of our present units of State Government.

"Having co-ordinated then the state business as it is co-ordinated in all successful businesses, the five or seven managers should by statute be required to organize and allocate to their several members the various functions of the departments. Their appointment by the Governor with the advice and consent of the Senate would require them to be experienced and capable in the different administrative functions. Each member would directly administer the duties assigned to him. In matters of dispute, the Board, as a whole, would sit. Collectively they would constitute the Governor's advisors. * * *"

As we understand from the record before us, the foregoing parts of plaintiff's platform and the public addresses delivered by him from time to time inspired the first article complained of, headed "Dangerous Experiment" in which the language was used:

"He (plaintiff) proposes a dictatorship with the Governor presiding over an appointive cabinet composed of officials now selected by vote of the people as provided in the Constitution.

"He (plaintiff) would not approve the existing form of government, but would remake it after his own pattern."

In the second article, headed "The State Races," among other things it was said:

"In the Governor's race the issue is clear, the people can either elect Attorney General James V. Allred, or vote for a continuation of the old political alignments, made more serious in this instance because their champion is also a visionary and a dreamer who would wreck the very form of government prescribed by the Constitution."

There were other expressions of a similar nature and some, which we conceive to be more drastic, contained in the third article headed "Do We Want A Revolution?"

The whole articles, with parts quoted by us, alleged to be particularly libelous, were before the court on presentation by defendant of its general demurrer. For the purposes of the demurrer the pleadings of plaintiff, which included innuendos, whether justified or not by the language used in the published articles, must, of necessity, be considered as true.

In some localities or countries, it may be considered a compliment to be designated as a "dictator." In its most common acceptation this means, according to Webster's New International Dictionary, one in whom is invested supreme authority in any line; one who rules as a dictator; one who prescribes for others authoritatively. But in this republican form of government, where the people love its system with pardonable pride, we cannot say that, as a matter of fact, to accuse one of being or seeking to be a dictator does not tend to injure his reputation and expose him to hatred, contempt, and ridicule.

The further expressions that plaintiff was a visionary and a dreamer, who would wreck the form of government prescribed by the Constitution, may, to some extent, have the same effect upon the minds of readers of such articles. To "wreck," according to the authority above mentioned, means destruction, disorganization, or serious injury of anything especially by violence.

Were the expressions, as contained in each of the articles, ambiguous? Were they

susceptible to more than one meaning? The plaintiff alleged they were used in their most common acceptation and meant what the ordinary reader would infer upon reading them. Plaintiff alleged, by innuendos, that parts of the articles complained of were defamatory and libelous. While the defendant contends, in the first place, that each and all of said articles were true, and in the alternative, that, if not literally true, then they were fair comment and criticism of what was contained in the plaintiff's platform and his public utterances, and further they were not susceptible to the meanings placed thereon by plaintiff.

In this connection, it was said by the Supreme Court in the case of Belo & Co. v. Smith, 91 Tex. 221, 225, 42 S.W. 850, 851:

"The question is: What effect would the publication have upon the mind of the ordinary reader? What construction would he have put upon it? For in defamatory language it is not so much the idea which the speaker or writer intends to convey as what he does in fact convey. It is the effect upon the character of the person alleged to be defamed by the utterance which the law considers, and therefore the utterer uses the language at his peril."

We do not think the court committed error in overruling the general demurrer to plaintiff's petition.

In the submission of the issues, the court gave to the jury a complete copy of each of the three publications, in as many inquiries, and required the jury to answer if they were true or false. This is assigned by defendant in several different forms as error. We think the assignments are well taken.

Had it not been for the limitations and specifications placed in plaintiff's pleadings, it may be said there was a complaint that the whole of each article was libelous, but from the reading of the articles it will be seen only certain portions thereof could, by any means, be construed to refer to plaintiff, and certainly he did not mean to plead, nor here contend, that those parts which had no reference to him were libelous. We think his allegations mean that the parts particularly referred to, about which there is little doubt, were references to him, are alleged to be the libelous matter.

In this connection his pleadings show:

"Plaintiff would further represent to the court that he has been libeled by defendant herein, that the defendant did, with actual malice towards this plaintiff libel this plaintiff in deliberately, wickedly and maliciously composing, printing, publishing and circulating the three editorials, namely, 'Dangerous Experiment,' particularly in paragraphs 7 and 8 thereof; 'The State Races,' particularly in paragraph 3 thereof, and 'Do We Want a Revolution?' particularly in paragraphs 3, 5, 6, 7, 9, 10, 11 and 12 thereof, fully set out hereinabove. * * *"

If it could be said the the above allegation is one complaining of the whole of each article which we doubt, yet his special allegations of those parts and paragraphs of the articles, which he has particularly plead, would, we think, confine him to those allegations as a ground of recovery. The rule of law seems to be well settled in this state that, if plaintiff pleads generally a state of facts, and goes farther and pleads specifically and particularly on the same subject, he cannot rely upon the general allegations, but is confined in his recovery to those specifically and particularly plead. Specific allegations will control those of a general character. Cavin & Grigsby v. Hill, 83 Tex. 73, 18 S.W. 323; De La Vergne Refrigerating Mach. Co. v. Stahl (Tex.Civ. App.) 54 S.W. 40; Ebersole v. Sapp (Tex. Com.App.) 208 S.W. 156; Gulf C. & S. F. Ry. Co. v. Younger (Tex.Civ.App.) 29 S.W. 948; Robert Oil Corporation v. Garrett (Tex.Civ.App.) 22 S.W.(2d) 508, affirmed by Supreme Court in 37 S.W.(2d) 135. It is true none of the above-cited cases involve an action for libel, yet we are cited to no authorities by plaintiff which announce a different rule in that class of litigation, and we have found none.

The jury was called upon by the issues propounded to answer whether the whole article in each instance, in so far as it purported to make statements concerning plaintiff, was true or false. In the publications headed "Dangerous Experiment" and "The State Races," the jury answered that they were false. It is easy to see how, with the whole article before them in the question, the jury could have found some reference to plaintiff therein, which was not literally true, yet, under the rule of law above mentioned, there was no allegation by plaintiff that such statement found by the jury to be false, constituted a libel against plaintiff. To put it another way, the jury was not required by the issue to determine whether or not the parts of said published articles, "particularly" alleged to constitute a libel, were true or false. It follows that even though the jury had found that some part

of the article not alleged to be libelous was false, and even though they had believed those parts alleged to be libelous were true, they could not truthfully answer the article as a whole was true. On account of the manner in which the issues were formed, the defendant was deprived of the privilege of having the jury determine if the particular parts of said articles alleged to be libelous, were true or false.

The whole of each article published was in evidence before the jury, and because of the answer raising the issue, the court should have inquired of the jury whether or not the portions thereof alleged to be libelous, were true or false. We do not mean to hold that the alleged libelous language should be passed upon, independent of the context of the article in which it was used; but the contrary is true, that is, the language complained of must be considered by the jury and construed in the light of all the facts and circumstances under which it was used. Moore v. Leverett (Tex.Com.App.) 52 S.W. (2d) 252; Cranfill v. Hayden, 97 Tex. 544, 80 S.W. 609; Guisti v. Galveston Tribune, 105 Tex. 497, 150 S.W. 874, 152 S.W. 167. The jury had before it the published articles, and was entitled to consider the whole of each, yet the inquiries should have been confined to those parts alleged to constitute a libel. We therefore hold it was error to submit the whole of each article in the special issues.

 Immediately following special issues Nos. 1 and 3, wherein the whole of the published articles "Dangerous Experiment" and "The State Races" were submitted to the jury and inquiry made if they were true or false, the court submitted special issues Nos. 2 and 4, No. 2 being in this language:

"If your answer to the preceding issue is 'false,' then you will answer the following issue:

"Do you find from a preponderance of the evidence that the editorial set out in Issue No. One was libelous, as that term has been defined to you, in so far as the same referred to the plaintiff, if it did refer to him?"

Issue No. 4 was in identically the same language as No. 2 above, except that it referred to the editorial set out in issue No. 3.

The defendant timely excepted and objected to the submission of these issues, and brings before us assignments of error challenging the action of the court in thus submitting the matter.

The rule seems to be well settled in this state that, if the language complained of is plain and unambiguous and defames the character of another, it is the duty of the trial court to so declare it. But, upon the other hand, if the language is ambiguous, fairly susceptible of more than one meaning, and requires proof of extrinsic facts to determine if it is libelous, then the question is one for the jury. Southern Publishing Co. v. Foster (Tex.Com.App.) 53 S.W. (2d) 1014, 1016, Newell, Slander and Libel (4th Ed.) 281.

In the case of Southern Publishing Co. v. Foster, supra, the court had under consideration a newspaper story which clearly was not libelous within itself, and having considered the innuendos and outside extrinsic matters alleged by plaintiff claimed to render it libelous, and discussing the established rules in such cases as we have herein announced, said:

"In the light of the foregoing rules, the court must determine if there is any evidence to support the judgment. When the above article is read and construed in the sense that ordinary readers would understand it, and this is made the test, we think it must be held that the language used in the publication complained of, when construed as a whole, constitutes no basis for an action for libel. This being true, the trial court should have instructed the jury to return a verdict for plaintiff in error."

In the opinion from which he have just quoted, this broad statement is made:

"The rule is established that, when the language used in the publication is ambiguous so that extrinsic evidence is needed to determine its character as to its being actionable or not actionable, if a jury is demanded to try the cause, it is the duty of the court to submit to the jury, under proper insructions, the issue as to whether or not the language used is libelous."

We think the language quoted is especially applicable to the facts of the case there under consideration by the court, but that as applied generally, a simplified construction of the meaning of the court's expression is that, under such conditions named, the court should by the submission of proper fact issues let the jury render its verdict on whether or not the article was fairly susceptible to the construction placed thereon by the plaintiff, and if the ordinary reader of the article would so understand it. When such verdict was returned, the trial court could then render judgment determining

whether or not, as a matter of law, the article was libelous.

Whether or not the alleged libelous articles were actionable under our statutes was the basis for plaintiff's entire lawsuit, and we cannot perceive of a condition under which it would be proper to submit that question in the form of a special issue to the jury; but rather that the jury should determine the fact issues concerning the meaning of the article written or words spoken, from which verdict the court may apply the law and determine if the acts constitute a libel.

We believe and so hold that it was error for the trial court to submit the special issues complained of and sustain the assignments of error thereto.

■ In view of another trial, we note from the record the court gave to the jury in charge a definition of the term "libel" in the words of the statute. We believe this was unnecessary and perhaps harmful, since the jury was not concerned in what would or would not constitute a libel in law but only as to the fact issues discussed herein by us. The definition as given is comprehensive of every form of libel whether involved in this case or not and tended to apprise the jury of the effect of the answers they may give in response to the fact issues inquired about. Article 2189, Rev.Civ.Statutes, only requires: "In submitting special issues the court shall submit such explanations and definitions of legal terms as shall be necessary to enable the jury to properly pass upon and render a verdict on such issues." It was therefore unnecessary for the court to explain the legal term "libel," since such explanation would in no way aid the jury in answering the issues we have indicated should have been submitted.

■ The defendant complains, by appropriate assignments of error, of that part of the explanation given by the court under special issue No. 8, in which issue the amount of plaintiff's actual damages was inquired about, the objection being that there was no proof offered to support it. Following special issue No. 8 the court instructed the jury:

"In answering the above issue No. 8, you may take into consideration the following elements, and them only:

"1. * * *

"2. Injury, if any, to the political career of plaintiff, if you shall find from a pre-ponderance of the evidence that there has been an injury to plaintiff's political career as a result of the publication of the newspaper articles herein complained of."

Plaintiff pleaded injury to his political career and asked for damages because therefor, actual as well as special. We think an officer or even a candidate for office could plead a state of facts which, if proven, would entitle him to actual or general damages to his political career, or, upon the other hand, he could so plead and prove it as a special damage. In the case of Jenkins v. Taylor (Tex.Civ.App.), 4 S. W.(2d) 656, 661, the court had under consideration the elements of plaintiff's general or actual damages for an alleged libelous instrument, and in discussing a requested instruction which was refused by the court, it was said:

"The jury should not have been limited to the injury to plaintiff's business; he was entitled to injury to his reputation generally, and also to his political career, especially the latter, since the attack made upon him was in connection with his conduct as an officer and while he was a candidate for the same office. The petition does not allege any special damage, and it was not necessary that any should be proved."

The opinion as reported does not disclose in what manner plaintiff claimed his political career had been injured, but we may assume the allegations supported the judgment and thus justified the appellate court in its statement of the law applicable to the case.

In Tex.Jur. vol. 27, p. 700, § 57, it is said: "Injury resulting to plaintiff's political career * * * are also proper elements of special damages when pleaded and proven."

Likewise, in case of Galveston Tribune v. Johnson, 141 S.W. 302, 304, in which a writ of error was refused, it was said: "Appellant specially excepted to certain portions of the petition wherein appellee set up as elements of special damages injury to his political career and his opportunities to secure public offices, which were overruled. In this we do not think the court erred." The language used by the court indicates that a plea had been made by plaintiff that would have entitled him to special damages on account of injury to his political career had it been proven.

The assignment of error before us, however, does not raise the question of whether

a recovery for damages to plaintiff's political career would have been special damages; and there was no such issue submitted to the jury, but the assignment is based upon the grounds that there was no testimony offered in support of that element of plaintiff's damages, and therefore it was error for the court to instruct the jury that they could take that item into consideration in arriving at the amount of damages to be awarded.

We have carefully read the transcript of the testimony offered and do not find anything to support the submission of that particular element of damages. The record is replete with testimony by the plaintiff that because of the published articles he has been humiliated, chagrined, and caused to suffer mental anguish of mind and body. His testimony tells in a very remarkable and peculiar way how his pride has been wounded, and how he has suffered from a consciousness of knowing other people have read and doubtless believed the publications. Upon inquiry by counsel, he gave many vivid descriptions of his own feelings, such as:

"Well, it is the things I said awhile ago, that neither I nor you or any one else can fully describe. It is a feeling and consciousness that there are thousands of people over the state that believe something about you that they ought not to believe, and ought not to have been made to believe, that hurts."

The nearest approach we have been able to find in the record appertaining to plaintiff's political career is disclosed by the following questions and answers:

"Q. Had you, just before you learned of these articles, given up the idea, or think you might continue in politics? A. I have never given up that idea, Judge.

"Q. Tell the jury how it affected you with reference to these statements circulated over Texas, and the charges made against you as to what effect it might have on you and what effect it did have on you? A. Any man that feels the need of citizenship as I feel it, realizes that among those who do not personally know him, that he has been hurt and to have had that campaign in hand, as I knew the different sections of the State, and to know the actual effect of it, it continued to gnaw away at the heart strings; that is all."

We consider the testimony quoted, along with a great volume of similar statements, go to make up the proof of damages to the feelings and peculiar type of suffering in mind and body by the plaintiff, rather than proof of damages to a political career, especially as an element of actual damages as distinguished from special damages. We think it was error for the trial court under this state of the testimony to instruct the jury that they could take into consideration injury to plaintiff's political career if they should find it had been injured, in arriving at the amount of actual damages to be awarded to plaintiff.

Defendant challenges by appropriate assignments of error the court's right to submit to the jury the element of exemplary damages, because of a lack of testimony to support such issue. We cannot agree with it in view of the testimony of plaintiff as to the conversation detailed between him and Governor W. P. Hobby, whom it was agreed was responsible for the policies of the paper published by defendant. In that conversation, none of which was denied by any one, the following is shown to have taken place: Plaintiff and Hobby met in the hotel lobby and the latter extended his hand to plaintiff, and they shook hands, and the following conversation ensued:

Plaintiff said: "I want you to know I am mindful of the fact that in the last days of the campaign you and your paper were dirty and hit below the belt. You struck me when I did not have time to give a return engagement and make another speech to your people. I want you to know I feel that way about it."

Hobby said: "Tom, we were in a hard fight. It took desperate efforts to win it. You ought to understand that, that we did it for political reasons, and we would like for you to forget it."

We consider this testimony sufficient to authorize the submission of the issue on malice, and overrule the several assignments and propositions raising the question.

We have not thought it necessary to discuss the twenty-one propositions presented by defendant in the order designated by it, but have discussed them rather in classes or groups as they bear upon a single deciding point in the appeal. There are assignments presented which we have not discussed at all but they are of such a nature that they perhaps will not occur upon a retrial of the case.

For the reasons pointed out in this opinion in which we consider the trial court committed errors material to the rights

of the defendant, we are compelled to reverse the judgment of the trial court and remand the cause for another trial, and it is accordingly done.