97 So.2d 819

George F. MYERS

v.

The MOBILE PRESS–REGISTER, Inc.

1 Div. 648.

Supreme Court of Alabama.

Oct. 31, 1957.

J. Connor Owens, Jr., Bay Minette, for appellant.

Hand, Arendall & Bedsole, Mobile, for appellee.

COLEMAN, Justice.

Appellant sued appellee for libel. The complaint contained two counts. Demurrer was sustained to each count. Appellant suffered a nonsuit and appealed. Errors assigned are the rulings sustaining demurrer to each count.

The alleged libel appeared as an editorial in appellee's newspaper on the 14th of October, 1953, as follows:

"Secret 25 Pushes Rule by Clique and Union Shop City Government

"Hear ye! Hear ye!

"Let the people be heard!

"Things have come to a pretty pass, indeed, when a small band of political fanciers, waxing in their victory, meet in secret session and petition the Mobile City Commission to do their bidding.

"Who are these 25 men who would conduct the affairs of the entire City of Mobile from the secrecy of a private club room—the rental paid by a saloon keeper—barring reporters and attempting to tell the commissioners elected by the people of Mobile what they must do?

"By what right does a tiny band led by a tavern operator, union bosses, a fired policeman, a political science professor who has resided in Mobile all of two years, and assorted 'kingmakers' profess to speak for our City of 130,000 souls?

"We say that Messrs. Luscher, Hackmeyer and Langan were elected to the City Commission by the people of Mobile. They were elected to serve the whole electorate. They were elected to serve the best interests of all the people.

"The people of Mobile, in the municipal election last month, most assuredly did not call for government by clique. They did not put into office a bunch of back room boys with axes to grind. They did not put their city into the hands of conspirators who met at secret 'social get-togethers' to work out their devious angles for presentation to the elected officials.

"Upon what meat do these our would-be Caesars feed that they have grown so strong and bold to run the city in the name of union bosses, tavern operators, and political science professors?

"An unholy combination, indeed. Their petition of rule by clique contains some points which look like leaves from a union organizer's notebook.

"Unionize the policemen, firemen and other city employees, say these

would-be usurpers from the secrecy of their private clubroom.

"The union bosses, tavern operator and political science professor want a union-controlled government. Where do the people come in? Who will be working for the public as a whole when the clique government sets up a union shop at City Hall?

"Even they admit in their petition the audacity of this proposal, for they seek to temporize this bold demand by saying that policemen and firemen 'should not be privileged to join unions claiming the right to strike.' Then why should they belong to a union at all?

"The secret committee of 25 would pitch us a curve. Maybe the policemen and firemen could not strike. But what is to keep them from turning up sick, all at once some fine day, when the backroom boys issue another edict from their Iron Curtain sanctum? What happens if they all go fishing at the same time? We recall that on a number of occasions the nation's coal mines have been closed down because the miners quit work and all the while Mr. John L. Lewis said there was no strike. Maybe the miners were sick or just needed an extended holiday. Maybe the secret 25 would prefer that the policemen and firemen go on a holiday when they feel the need to assert their influence down at City Hall.

"The people of Mobile elected a City Commission to run their government. We hope and trust that the three commissioners will serve the best interests of all the people. We hope they will turn a deaf ear to axe-grinding cliques who issue edicts from their secret confines.

"We urge the new City Commission to reassure an anxious public that Mobile still has representative government, elected officials who think of the people first, last and always, and not rapacious rule by political worthies who believe in dictatorship from the back room—the dark room of secrecy and angle plotting."

It was further averred in the complaint that on October 13th, 1953, prior to the time of the alleged libelous publication, appellee published "a front page story in bold type identifying the plaintiff (appellant) by name as a 'tavern operator', who met with the group so referred to in said editorial quoted above."

In McGraw v. Thomason, 265 Ala. 635, 639, 93 So.2d 741, 744, the following was said:

"The definitions of libel, as found in the cases, vary somewhat in phraseology, and are more or less comprehensive, as may be called for by the particular charge involved in the case. Generally, any false and malicious publication, when expressed in printing or writing, or by signs or pictures, is a libel, which charges an offense punishable by indictment, or which tends to bring an individual into public hatred, contempt, or ridicule, or charges an act odious and disgraceful in society. This general definition may be said to include whatever tends to injure the character of an individual, blacken his reputation, or imputes fraud, dishonesty, or other moral turpitude, or reflects shame, or tends to put him without the pale of social intercourse. [Citations omitted.]"

See, also:

"Defamatory words may be divided into those that are actionable per se, and those that are actionable per quod, depending on the nature of the charge embodied in the words. Defamatory words actionable per se are those which on their face and without the aid of extrinsic proof are recognized as injurious; but if the injurious character of the words appears, not from their face in their usual and natural signification, but only in consequence of ex-

trinsic facts, showing the circumstances under which they were said or the damages which resulted to the defamed party therefrom, they are not defamatory per se, * * *." 53 C.J.S. Libel and Slander § 8, pp. 41, 42.

When the language used is not actionable per se, it is incumbent upon the plaintiff to allege special damages. Harrison v. Burger, 212 Ala. 670, 103 So. 842. Appellant alleges no special damage in either count in the instant case; therefore, the publication complained of must be libel per se or the complaint states no cause of action. Trimble v. Anderson, 79 Ala. 514. The appellant in his brief makes the following concession:

"* * * Clearly, since no special damages are alleged in either Count, both Counts set out an action in libel *per se*, the entire case being based upon said publication as being libel *per se*. * * *."

Thus, we are presented with the question: Are the words so written libel per se? We answer in the negative.

Appellant argues that the word "saloon keeper" as used in the publication referred to appellant and that the publication is therefore libelous per se because of § 44, Title 29, Code 1940, which provides in part:

"* * * It is the intent and purpose of this chapter that no so-called open saloon be operated within this state. * * *"

This court has stated one definition of "saloon" as follows:

"* * * The 'saloon,' in common parlance, is a place where intoxicating liquors are sold. It has other definitions, * * *." Fourment v. State, 155 Ala. 109, 113, 46 So. 266, 267.

Title 29 does not make unlawful the operation of all places where intoxicating liquors are sold, but does make unlawful the operation of such places in a prohibited manner. In ordinary usage, to say of the plaintiff that he is a saloon keeper is to say that he is the keeper of a place where intoxicating liquors are sold, but unless more is said, such a statement does not on its face say that plaintiff is keeping such a place in an unlawful manner, or that he is otherwise violating the law. We have not been cited to or found any case where to call a person a "saloon keeper" has been held libelous per se. It does not follow that because a person has been falsely called a "saloon keeper" that it is presumed as a matter of law that the reputation of that person has been damaged. Where the publication is libelous per se, damage to reputation is presumed.

"The communication being libelous per se * * * the law presumes such general damage to the plaintiff as mental suffering and injury to his reputation, and it necessarily follows that these elements of damage need not be alleged in the complaint not (sic, nor) supported by proof. * * *" Starks v. Comer, 190 Ala. 245, 254, 67 So. 440, 443.

"In cases of libel, if the language used exposes the plaintiff to public ridicule or contempt, though it does not embody an accusation of crime, *the law presumes damage to the reputation, and pronounces it actionable per se. * * *"* (Emphasis supplied.) Marion v. Davis, 217 Ala. 16, 18, 114 So. 357, 359, 55 A.L.R. 171.

"* * * Words libelous per se import damage, * * *" White v. Birmingham Post Co., 233 Ala. 547, 550, 172 So. 649, 652.

In arguing that the publication is libelous per se, appellant points out specifically the following terms used in the publication: "Conspirator," "unholy combination," "Iron Curtain," "rapacious rule," and "dictatorship." In support of this argument, appellant cites Cerveny v. Chicago Daily News Co., 139 Ill. 345, 28 N.E. 692,

13 L.R.A. 864, where on demurrer it was held libelous to falsely publish of a person that he is an "anarchist," since one who advocates anarchy, which is commonly understood as subversive of all government, is liable thereby to be brought into hatred or contempt. The editorial in the instant case certainly does not charge that appellant is opposed to all government.

Appellant cites also Houston Printing Company v. Hunter, Tex.Civ.App.1937, 105 S.W.2d 312, 313, where on appeal it was held that the general demurrer to the petition or complaint, was properly overruled. The publication there complained of stated that plaintiff " ' * * * proposes a dictatorship, * * * would not approve the existing form of government, but would remake it after his own pattern. * * * * " and " ' * * * is also a visionary and a dreamer who would wreck the very form of government prescribed by the constitution'." Plaintiff further charged that the language used was " * * * 'employed * * * in the sense and meaning of one opposed to a Republican form of government, and one who would appropriate unto himself arbitrary, unconstitutional and unlawful and dictatorial powers in violation of the Constitution of the United States of America. * * * That the defendant herein in the use, sense and meaning of the said malicious libels imputed to this plaintiff corrupt, evil, unlawful and reprehensible motives and purposes in seeking to be elected Governor of the State of Texas.' "

In the Hunter case, supra, the opinion does not state that the publication there set out was libelous per se. In pertinent part, the opinion said:

"* * * For the purposes of the demurrer the pleadings of plaintiff, which included innuendos [sic], *whether justified or not by the language used in the published articles,* must, of necessity, be considered as true." (Emphasis supplied.)

We will observe that the rule with respect to the office of innuendo has been stated differently in Alabama. This court has said:

"* * * If the matters going before the innuendo do not constitute libel or slander, no words contained in the innuendo can make the language used actionable, for it is not the nature or purpose of an innuendo to state the cause of action." Age-Herald Publishing Co. v. Waterman, 188 Ala. 272, 281, 66 So. 16, 19.

and also:

"* * * 'The only office of the innuendo is to explain some matter already expressed, or to serve to point out where there is precedent matter. It may apply what is already expressed, but cannot add to, enlarge, or change the sense of the previous words. If the meaning given to the words by the innuendo is broader than the words would naturally bear, the pleading is bad, for, in law, the innuendo is but the deduction of the pleader from the words used in the publication, and this court has repeatedly held that it is for the court to say whether the meaning charged by the innuendo is supported by the language used in the publication. Henderson v. Hale, 19 Ala. 154; Wofford v. Meeks, 129 Ala. 349, 30 So. 625, 55 L.R.A. 214, 87 Am.St.Rep. 66; Gaither v. Advertiser Co., 102 Ala. 458, 14 So. 788.' " Meadors v. Haralson, 226 Ala. 413, 415, 147 So. 184, 185.

See, also, 13 Ala.Dig., Libel & Slander, ⊜86(1).

In the case at bar, plaintiff charges by innuendo in the second count that the publication shows an intention on part of defendant to create the belief that plaintiff was exerting "corrupting influence upon the City Commission of Mobile" and that plaintiff was a man "who was part of a secret or unlawful combination organized for an *unlawful purpose.*" (Emphasis supplied.) The published words do not support the plaintiff's deduction.

A fair reading of the editorial leads us to conclude that appellant has been charged thereby with planning, in concert with others, to petition or influence the City Commission of Mobile to "unionize" policemen, firemen, and other city employees. The conduct so imputed to plaintiff certainly does not constitute an indictable offense, and we are unable to conclude that the charge of such conduct tends to bring the plaintiff, "into public hatred, contempt, or ridicule, or charges an act odious and disgraceful in society."

Plaintiff and his alleged associates had the right to petition the city governing body and thereby attempt to influence it, and the charge that they met in secret does not alter the nature of the conduct charged. This court has held more distasteful language not to be actionable per se. See Trimble v. Anderson, supra, where it was held not libelous per se to publish of the plaintiff that he had obtained certain notes from one whose mental condition incapacitated him for business dealings, and without paying any consideration for the notes.

In Wabash R. Co. v. Young, 162 Ind. 102, 106, 107, 69 N.E. 1003, 1005, 4 L.R.A.,N.S., 1091, the defendant published of the plaintiff in a letter the following statement:

> " 'If you want a man who is strictly a labor agitator, this is your man.' (meaning appellee) ; * * *."

The Indiana Court said:

> " * * * It appears that no act was done by the appellant through its agents except to inform the officers of the Atchison, Topeka & Sante Fe Railroad Company and the Denver & Rio Grande Railroad Company that the appellee (plaintiff) was a member of a labor organization, and that he was a labor agitator. It is not alleged that a charge of this nature was calculated to injure the appellee, or that any odium attached to members of such orders or to labor agitators. The charge was not

libelous per se, * * *." (Parenthesis added.)

In Chicago, R. I. & P. Ry. Co. v. Medley, 55 Okl. 145, 155 P. 211, 212, L.R.A.1916D, 587, in an action of libel, the publication complained of was a letter stating in pertinent part as follows:

> " 'To Whom It May Concern: This is to certify that Mr. N. H. Medley (plaintiff) has been employed at Enid, Oklahoma, * * * as car repairer, * * * he was discharged for being an agitator and creating trouble in the ranks of our car men at Enid. Services unsatisfactory on this account. * * *' " (Parenthesis added.)

With reference to this letter, the Oklahoma Court said:

> "The plaintiff, in his petition, ascribes no peculiar or special meaning to the words used in the service letter. Considering them in their plain, natural, popular, and obvious sense, are they libelous per se, within the meaning of our statute? We think not. They do not impeach his skill or ability as a car repairer, neither do they impute any fraud, dishonesty, misconduct, or incapacity in his trade. They certainly do not subject him to public hatred, contempt, ridicule, or obloquy, or deprive him of public confidence. Considering the language of this letter, in connection with the facts and circumstances under which it was issued, and the occasion for its issuance, one would infer that the plaintiff was a labor agitator, and as such caused trouble among the company's men, with whom he worked; but, be this as it may, no special meaning is ascribed to the language used, and we are unable to see under what theory this letter could be regarded as libelous per se. * * * We think it would be going too far to hold that the language used in this letter is libelous per se."

In support of its holding, the Oklahoma Court cited, among other authorities, two Alabama cases.

One of these cases, Tennessee Coal, Iron & Ry. Co. v. Kelly, 163 Ala. 348, 351, 50 So. 1008, 1009, involved certain counts for libel based on letters written by agents of defendant, acting within the scope of their authority, charging that certain of defendant's employees were union laborers and that they had:

"* * * 'run some of the defendant's nonunion laborers out of their houses, and otherwise demoralized the organization of the coal mines department, to such an extent that no one was at work.'"

The plaintiff was named as one of the union men causing the disturbance. This court said:

"For these reasons we think the court erred in refusing defendant's requested charge No. 5. The letter referred to in the charge was certainly not libelous per se, and the defendant had the right to have the court so instruct the jury, * * *"

In the second Alabama case cited by the Oklahoma Court, the publication of a notice that a certain contractor had been placed on the "unfair list" of a carpenters' union, together with a statement that the publication of such notice would be continued until he decided to set himself square with organized labor, was held not to be libelous per se. Labor Review Publishing Company v. Galliher, 153 Ala. 364, 45 So. 188.

In the instant case, while some of the words used are harsh and not calculated to endear the newspaper to the subjects of the editorial, the publication complained of is not libelous per se.

The demurrer was properly sustained.

Affirmed.

LIVINGSTON, C. J., and SIMPSON and GOODWYN, JJ., concur.