144 So.2d 25

The NEW YORK TIMES COMPANY et al.

v.

L. B. SULLIVAN.

3 Div. 961.

Supreme Court of Alabama.

Aug. 30, 1962.

T. Eric Embry, Beddow, Embry & Beddow and Fred Blanton, Birmingham, and Lord, Day & Lord and Herbert Wechsler, New York City, for appellant New York Times.

Chas. S. Conley and Vernon Z. Crawford, Montgomery, for individual appellants.

R. E. Steiner, III, Sam Rice Baker, M. R. Nachman, Jr., Steiner, Crum & Baker and Calvin M. Whitesell, Montgomery, for appellee.

HARWOOD, Justice.

This is an appeal from a judgment in the amount of $500,000.00 awarded as dam-

ages in a libel suit. The plaintiff below was L. B. Sullivan, a member of the Board of Commissioners of the City of Montgomery, where he served as Police Commissioner. The defendants below were The New York Times, a corporation, and four individuals, Ralph D. Abernathy, Fred L. Shuttlesworth, S. S. Seay, Sr., and J. E. Lowery.

Service of the complaint upon The New York Times was by personal service upon Dan McKee as an agent of the defendant, and also by publication pursuant to the provisions of Sec. 199(1) of Tit. 7, Code of Alabama 1940.

The Times moved to quash service upon it upon the grounds that McKee was not its agent, and The Times, a foreign corporation, was not doing business in Alabama, and that service under Sec. 199(1) was improper, and to sustain either of the services upon it would be unconstitutional.

After hearing upon the motion to quash, the lower court denied such motion.

In this connection the plaintiff presented evidence tending to show The Times gathers news from national press services, from its staff correspondents, and from string correspondents, sometimes called "stringers."

The Times maintained a staff correspondent in Atlanta, Claude Sitton, who covered eleven southern states, including Alabama.

During the period from 1956 through April 1960, regular staff correspondents of The Times spent 153 days in Alabama to gather news articles for submission to The Times. Forty-nine staff news articles so gathered were introduced in evidence.

Sitton himself was assigned to cover in Alabama, at various times, the so-called "demonstrations," the hearings of the Civil Rights Commission in Montgomery, and proceedings in the United States District Court in Montgomery. During his work in Alabama, he also conducted investigations and interviews in such places as Clayton and Union Springs. On some of his visits to Alabama, Sitton would stay as long as a week or ten days.

In May of 1960, he came to Alabama for the purpose of covering the Martin Luther King trial. After his arrival in Montgomery, he "understood" an attempt would be made to serve him. He contacted Mr. Roderick McLeod, Jr., an attorney representing The Times, and was advised to leave Alabama. Shortly after this he called McKee, the "stringer" in Montgomery, and talked generally about the King trial with him.

In addition, The Times made an active effort to keep a resident "stringer" in Montgomery at all times, and as a matter of policy wanted to have three "stringers" in Alabama at all times.

The work of "stringers" was outlined by Sitton as follows: "When The Times feels there is a news story of note going on in an area where a particular stringer lives, * * * The Times calls on a stringer for a story."

"Stringers" fill out blank cards required by The Times, which refer to them as "our correspondents." Detailed instructions are also given to "stringers" by The Times.

"Stringers" also on occasions initiate stories to The Times by telephone recordation. If these stories were not accepted, The Times pays the telephone tolls.

A "stringer" is usually employed by another newspaper, or news agency and is called upon for stories occasionally, or offers stories upon his own. A "stringer" is paid at about the rate of a penny a word. No deductions are made from these payments for such things as income tax, social security, insurance contributions, etc., and "stringers" are not carried on the payroll of The Times. Up to July 26 for the year 1960, The Times had paid Chadwick, the "stringer" in Birmingham, $135.00 for stories accepted, and paid McKee $90.00.

It further appears that upon receipt of a letter from the plaintiff Sullivan demanding a retraction and apology for the statements appearing in the advertisement, which is the basis of this suit, the general counsel of The Times in New York requested the Assistant Managing Editor of The Times to have an investigation made of the correctness of the facts set forth in the advertisement in question. The Times thereupon communicated with McKee and asked for a report. After his investigation, McKee sent a lengthy wire to The Times setting forth facts which demonstrated with clarity the utter falsity of the allegations contained in the advertisement. McKee was also paid $25.00 by The Times for help given Harrison Salisbury, a staff correspondent of The Times when he was in Alabama on an assignment in the spring of 1960.

The Times also has a news service and sells to other papers stories sent it by its staff correspondents, "stringers," and local reporters. In this connection the lower court observed:

"Obviously, The Times considered the news gathering activities of these staff correspondents and 'stringers' a valuable and unique complement to the news gathering facilities of the Associated Press and other wire services of which The Times is a member. The stories of the 'stringers' appear under the 'slug' 'Special to The New York Times,' and there were 59 such 'specials' in the period from January 1, 1956, through April of 1960."

## Advertising

About three quarters of the revenue of The Times comes from advertisements. In 1956, The New York Times Sales, Inc., was set up. This is a wholly owned subsidiary of The Times and its sole function is to solicit advertising for The Times only.

All of the officials of "Sales" are also officials of The Times.

Two solicitors for "Sales," as well as two employees of The Times have at various times come into Alabama seeking advertising for The Times. Between July 1959 and June 3, 1960, one representative spent over a week in this State, another spent a week and a third spent three days. Advertising business was solicited in Birmingham, Montgomery, Mobile, and Selma. Between January 1, 1960 and May 1960, inclusive, approximately seventeen to eighteen thousand dollars worth of advertising was thus sold in Alabama, while in the period of 1956 through April 1960, revenues of $26,801.64 were realized by The Times from Alabama advertisers.

## Circulation

The Times sends about 390 daily, and 2,-500 Sunday editions into Alabama.

Shipments are made by mail, rail, and air, with transportation charges being prepaid by The Times. Dealers are charged for the papers.

Credit is given for unsold papers and any loss in transit is paid by The Times.

Claims for losses are handled by baggagemen in Alabama, and The Times furnishes claim cards to dealers who bring them to the baggagemen, The Times paying for losses or incomplete copies upon substantiation by the local Alabama baggagemen.

Account cards of various Alabama Times dealers show that credit was thus given for unsold merchandise.

We are here confronted with the question of in personam jurisdiction acquired by service upon an alleged representative of a foreign corporation.

The severe limitations of the doctrine of Bank of Augusta v. Earle (1839) 13 Pet. 519, 13 U.S. 519, 10 L.Ed.2d 274, that a corporation "must dwell in the place of its creation, and cannot migrate to another sovereignty," proving unsatisfactory, the courts, by resort to fictions of "presence," "consent," and "doing business," attempted

to find answers compatible with social and economic needs. Until comparatively recent years these bases of jurisdictions have tended only to confuse rather than clarify, leading the late Judge Learned Hand to remark that it was impossible to determine any established rule, but that "we must step from tuft to tuft across the morass." Hutchinson v. Chase and Gilbert, (2 Cir.) 45 F.2d 139.

In Pennoyer v. Neff, 95 U.S. 714, 24 L. Ed. 565, the court held that the Fourteenth Amendment to the Federal Constitution required a relationship between the State and the person upon whom the State seeks to exercise personal jurisdiction, and there must be a reasonable notification to the person upon whom the State seeks to exercise its jurisdiction. The required relationship between the State and the person was held to be presence within the State, and as a corollary, no state could "extend its process beyond that territory so as to subject either persons or property to its decisions."

In Hess v. Pawloski, 274 U.S. 352, 47 S. Ct. 632, 71 L.Ed. 1091 (1927), the United States Supreme Court sustained the validity of a non-resident motorist statute which provided that the mere act of driving an automobile in a state should be deemed an appointment of a named state official as agent to receive service in a suit arising out of the operation of the motor vehicle on the highway of such state. The dangerous nature of a motor vehicle was deemed to justify the statute as a reasonable exercise of police power to preserve the safety of the citizens of the state, and the consent for service exacted by the State for use of its highways was reasonable.

In 1935 the same reasoning was applied in upholding a state statute permitting service on an agent of a non-resident individual engaged in the sale of corporate securities in the state in claims arising out of such business. Henry L. Doherty and Co. v. Goodman, 294 U.S. 623, 55 S.Ct. 553, 79 L.Ed. 1097.

Corporations being mere legal entities and incapable of having physical presence as such in a foreign state, and its agents being limited by the scope of their employment, neither the "presence" theory nor the "consent" theory could satisfactorily be applied as a basis for personal jurisdiction.

As to personal jurisdiction over non-resident corporations, the rule therefore evolved that such jurisdiction could be based upon the act of such corporations "doing business" in a state, though echoes of the "presence" and "consent" doctrines may be found in some decisions purportedly applying the "doing business" doctrine in suits against foreign corporations. See Green v. Chicago Burlington and Quincy Ry., 205 U.S. 530, 27 S.Ct. 595, 51 L.Ed. 916, when "presence" of a corporation was found to exist from business done in a state, and Old Wayne Mutual Life Ass'n. of Indianapolis v. McDonough, 204 U.S. 8, 27 S.Ct. 236, 51 L.Ed. 345, where implied consent to jurisdiction was said to arise from business done in the state of the forum.

The term "doing business" carries no inherent criteria. It is a concept dependent upon each court's reaction to facts. These reactions were varied, and the conflicting decisions evoked the observation of Judge Learned Hand, then fully justified, but no longer apt since the "morass" has been considerably firmed up by subsequent decisions of the United States Supreme Court.

In International Shoe Co. v. State of Washington et al., 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95, the old bases of personal jurisdiction were re-cast, the court saying:

"To say that the corporation is so far 'present' there as to satisfy due process requirements * * * is to beg the question to be decided. For the terms 'present' or 'presence' are used merely to symbolize those activities of the corporations's agent within the state which courts will deem to be sufficient to satisfy the demands of due process. * * * Those demands may

be met by such contacts of the corporation with the state of the forum as make it reasonable, in the context of our federal system of government, to require the corporation to defend the particular suit which is brought there. An 'estimate of the inconveniences' which would result to the corporation from a trial away from its 'home' or principal place of business is relevant in this connection."

That the new test enunciated is dependent upon the degree of contacts and activities exercised in the forum state is made clear, the court saying:

"* * * due process requires only that in order to subject a defendant to a judgment *in personam*, if he be not present within the territory of the forum, we have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' "

In accord with the above doctrine is our case of Boyd v. Warren Paint and Color Co., 254 Ala. 687, 49 So.2d 559.

In 1957 the United States Supreme Court handed down its opinion in McGee v. International Life Insurance Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223. This case involved the validity of a California judgment rendered in a proceeding where service was had upon the defendant company by registered mail addressed to the respondent at its principal place of business in Texas. A California statute subjecting foreign corporations to suit in California on insurance contracts with California residents even though such corporations could not be served with process within its borders.

The facts show that petitioner's son, a resident of California, bought a life insurance policy from an Arizona corporation, naming petitioner as beneficiary. Later, respondent, a Texas corporation, agreed to assume the insurance obligations of the Arizona company, and mailed a re-insurance certificate to the son in California, offering to insure him in accordance with his policy. He accepted the offer and paid premiums by mail from California to the company's office in Texas. Neither corporation ever had any office in California, nor any agent therein, nor had solicited or done any other business in that state. Petitioner sent proofs of her son's death to respondent, but it refused to pay the claim.

The Texas court refused to enforce the California judgment holding it void under the Fourteenth Amendment because of lack of valid service. McGee v. International Life Insurance Company, Tex.Civ.App., 288 S.W.2d 579.

In reversing the Texas Court, the United States Supreme Court wrote:

"Since Pennoyer v. Neff, 95 U.S. 714, 24 L.Ed. 565, this Court has held that the Due Process Clause of the Fourteenth Amendment places some limit on the power of state courts to enter binding judgments against persons not served with process within their boundaries. But just where this line of limitation falls has been the subject of prolific controversy, particularly with respect to foreign corporations. In a continuing process of evolution this Court accepted and then abandoned 'consent,' 'doing business,' and 'presence' as the standard for measuring the extent of state judicial power over such corporations. See Henderson, The Position of Foreign Corporations in American Constitutional Law, c. V. More recently in International Shoe Co. v. State of Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95, the Court decided that 'due process requires only that in order to subject a defendant to a judgment *in personam*, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend " 'traditional notions of fair play and substantial jus-

tice.' " ' 326 U.S. at 316, 66 S.Ct. at 158.

"Looking back over this long history of litigation a trend is clearly discernible toward expanding the permissible scope of state jurisdiction over foreign corporations and other nonresidents. In part this is attributable to the fundamental transformation of our national economy over the years. Today many commercial transactions touch two or more States and may involve parties separated by the full continent. With this increasing nationalization of commerce has come a great increase in the amount of business conducted by mail across state lines. At the same time modern transporation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity."

 Under the above and more recent doctrines, we are clear to the conclusion that the activities of The New York Times, as heretofore set out, are amply sufficient to more than meet the minimal standards required for service upon its representative McKee.

The adjective "string" in McKee's designation is redundant, and in no wise lessens his status as a correspondent and agent of The New York Times in Alabama. Justice demands that Alabama be permitted to protect its citizens from tortious libels, the effects of such libels certainly occurring to a substantial degree in this State.

### Substituted Service

By Act No. 282, approved 5 August 1953 (Acts of Alabama, Reg.Sess.1953, page 347) amending a prior Act of 1949, it was provided that any non-resident person, firm, partnership or corporation, not qualified to do business in this State, who shall do any business or perform any character of work or service in this State shall by so doing, be deemed to have appointed the Secretary of State to be his lawful attor-

ney or agent of such non-resident, upon whom process may be served in any action accruing from the acts in this State, or incident thereto, by any non-resident, or his or its agent, servant or employee.

The act further provides that service of process may be made by service of three copies of the process on the Secretary of State, and such service shall be sufficient service upon the non-resident, provided that notice of such service and a copy of the process are forthwith sent by registered mail by the Secretary of State to the defendant, at his last known address, which shall be stated in the affidavit of the plaintiff, said matter so mailed shall be marked "Deliver to Addressee Only" and "Return Receipt Requested," and provided further that such return receipt shall be received by the Secretary of State purporting to have been signed by the said non-resident.

It is further provided in the Act that any party desiring to obtain service under the Act shall make and file in the cause an affidavit stating facts showing that this Act is applicable.

 A mere reading of the above Act demonstrates the sufficiency of the provisions for notice to the non-resident defendant, and that service under the provisions of the Act fully meet the requirements of due process.

Counsel for appellant argues however that the service attempted under Act 282, supra, is defective in two aspects. First, that the affidavit accompanying the complaint is conclusionary and does not show facts bringing the Act into operation, and second, that the Act complained of did not accrue from acts done in Alabama.

The affidavit filed by the plaintiff avers that the defendant " * * * has actually done and is doing business or performing work or services in the State of Alabama; that this cause of action has arisen out of the doing of such business or as an incident thereof by said defendant in the State of Alabama."

The affidavit does state facts essential to the invocation of Act 282, supra. We do not think the legislative purpose in requiring the affidavit was to require a detailed quo modo of the business done, but rather was to furnish the Secretary of State with information sufficient upon which to perform the duties imposed upon that official. The ultimate determination of whether the non-resident has done business or performed work or services in this State, and whether the cause of action accrues from such acts, is judicial, and not ministerial, as demonstrated by appellant's motion to quash.

As to appellant's second contention that the cause did not accrue from any acts of The Times in Alabama, it is our conclusion that this contention is without merit.

Equally applicable to newspaper publishing are the observations made in Consolidated Cosmetics v. D–A Pub. Co., Inc., et al., 7 Cir., 186 F.2d 906 at 908, relative to the functions of a magazine publishing company:

> "The functions of a magazine publishing company, obviously, include gathering material to be printed, obtaining advertisers and subscribers, printing, selling and delivering the magazines for sale. Each of these, we think, constitutes an essential factor of the magazine publication business. Consequently if a non-resident corporation sees fit to perform any one of those essential functions in a given jurisdiction, it necessarily follows that it is conducting its activities in such a manner as to be subject to jurisdiction."

It is clear under our decisions that when a non-resident prints a libel beyond the boundaries of the State, and distributes and publishes the libel in Alabama, a cause of action arises in Alabama, as well as in the State of the printing or publishing of the libel. Johnson Publishing Co. v. Davis, 271 Ala. 474, 124 So.2d 441; Weir v. Brotherhood of Railroad Trainmen, 221 Ala. 494, 129 So. 267; Bridwell v. Brotherhood of Railroad Trainmen, 227 Ala. 443, 150 So. 338; Collins v. Brotherhood of Railroad Trainmen, 226 Ala. 659, 148 So. 133.

The scope of substituted service is as broad as the permissible limits of due process. Boyd v. Warren Paint & Color Co., 254 Ala. 687, 49 So.2d 559; Ex parte Emerson, 270 Ala. 697, 121 So.2d 914.

The evidence shows that The Times sent its papers into Alabama, with its carrier as its agent, freight prepaid, with title passing on delivery to the consignee. See Tit. 57, Sec. 25, Code of Alabama 1940; 2 Williston on Sales, Sec. 279(b), p. 90. Thence the issue went to newsstands for sale to the public in Alabama, in accordance with a long standing business practice.

The Times or its wholly owned advertising subsidiary, on several occasions, had agents in Alabama for substantial periods of time soliciting, and procuring in substantial amounts advertising to appear in The Times.

Furthermore, upon the receipt of the letter from the plaintiff demanding a retraction of the matter appearing in the advertisement, The Times had its string correspondent in Montgomery, Mr. McKee, investigate the truthfulness of the assertions in the advertisement. The fact that McKee was not devoting his full time to the service of The Times is "without constitutional significance." Scripto Inc. v. Carson, Sheriff, et al., 362 U.S. 207, 80 S.Ct. 619, 4 L.Ed.2d 660.

In WSAZ, Inc. v. Lyons, 254 F.2d 242 (6 Cir.), the defendant television corporation was located in West Virginia. Its broadcasts covered several counties in Kentucky, and the defendant contracted for advertising in the Kentucky counties, all contracts for such advertising being sent to the corporation in West Virginia for acceptance.

The alleged libel sued upon occurred during a news broadcast.

Service was obtained by serving the Kentucky Secretary of State under the provisions of a Kentucky statute providing for such service upon a foreign corporation doing business in Kentucky where the action arose out of or was "connected" with the business done by such corporation in Kentucky.

In sustaining the judgment awarded the plaintiff, the court wrote in connection with the validity of the service to support the judgment:

"All that is necessary here is that the cause of action asserted shall be 'connected' with the business done. Defendant asserts that the alleged libel has no connection with its business done in Kentucky. But in view of its admission that its usual business was the business of telecasting and that this included news programs, and in view of the undisputed fact that the alleged libel was part of news programs regularly broadcast by defendant, this contention has no merit.

"The question of due process would seem to be settled by the case of McGee v. International Life Insurance Co. (citation), as well as by International Shoe Co. v. State of Washington, supra. While defendant was not present in the territory of the forum, it certainly had substantial contacts with it. It sought and executed contracts for the sale of advertising service to be performed and actually performed by its own act within the territory of the forum. We conclude that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"

In the present case the evidence shows that the publishing of advertisements was a substantial part of the business of The Times, and its newspapers were regularly sent into Alabama. Advertising was solicited in Alabama. Its correspondent McKee was called upon by The Times to investigate the truthfulness or falsity of the matters contained in the advertisement after the letter from the plaintiff. The acts therefore disclose not only certain general conditions with reference to newspaper publishing, but also specific acts directly connected with, and directly incident to the business of The Times done in Alabama.

The service acquired under the provisions of Act No. 282, supra, was valid.

### General Appearance by The Times

■ The trial court also found that The Times, by including as a ground of the prayer in its motion to quash, the following, " * * * that this court dismiss this action as to The New York Times Company, A Corporation, for lack of jurisdiction of the subject matter of said action * * *" did thereby go beyond the question of jurisdiction over the corporate person of The Times, and made a general appearance, thereby waiving any defects in service of process, and thus submitted its corporate person to the jurisdiction of the court.

The conclusions of the trial court in this aspect are in accord with the doctrines of a majority of our sister states, and the doctrines of our own decisions.

■ Pleadings based upon lack of jurisdiction of the person are in their nature pleas in abatement, and find no special favor in the law. They are purely dilatory and amount to no more than a declaration by a defendant that he is in court in a proper action, after actual notice, but because of a defect in service, he is not legally before the court. See Olcese v. Justice's Court, 156 Cal. 82, 103 P. 317.

In Roberts v. Superior Court, 30 Cal.App. 714, 159 P. 465, the court observed:

"The motion to dismiss the complaint on the ground that the court was without jurisdiction of the subject-matter of the action amounted, substantially or in legal effect, to a demurrer to the complaint on that ground. At all events, a motion to dismiss on the

ground of want of jurisdiction of the subject-matter of the action necessarily calls for relief which may be demanded only by a party to the record. It has been uniformly so held, as logically it could not otherwise be held, and, furthermore, that where a party appears and asks for such relief, although expressly characterizing his appearance as special and for the special purpose of objecting to the jurisdiction of the court over his person, he as effectually submits himself to the jurisdiction of the court as though he had legally been served with process."

The reason dictating such conclusion is stated by the Supreme Court of North Carolina, in Dailey Motor Co. v. Reaves, 184 N.C. 260, 114 S.E. 175, to be:

"Any course that, in substance, is the equivalent of an effort by the defendants to try the matter and obtain a judgment on the merits, in any material aspect of the case, while standing just outside the threshold of the court, cannot be permitted to avail them. A party will not be allowed to occupy so ambiguous a position. He cannot deny the authority of the court to take cognizance of his action for want of jurisdiction of the person or proceeding, and at the same time seek a judgment in his favor on the ground that there is no jurisdiction of the cause of action.

\* \* \* \* \* \*

"We might cite cases and authorities indefinitely to the same purpose and effect, but those to which we have briefly referred will suffice to show how firmly and unquestionably it is established, that it is not only dangerous, but fatal, to couple with a demurrer, or other form of objection based upon the ground that the court does not have jurisdiction of the person, an objection in the form of a demurrer, answer, or otherwise, which substantially pleads to the merits, and, as we have seen, such an objection is presented when the de-

fendant unites with his demurrer for lack of jurisdiction of the person, a cause of demurrer for want of jurisdiction of the cause or subject of the action, and that is exactly what was done in this case."

We will not excerpt further from the decisions from other jurisdictions in accord with the doctrine of the above cases, but point out that innumerable authorities from a large number of states may be found set forth in an annotation to be found in 25 A.L.R.2d, pages 838 through 842.

In Thompson v. Wilson, 224 Ala. 299, 140 So. 439, this court stated:

"If there was a general appearance made in this case, the lower court had jurisdiction of the person of the appellant. (Authorities cited.)

"The filing of a demurrer, unless based solely on the ground of lack of jurisdiction of the person, constitutes a general appearance."

Again, in Blankenship v. Blankenship, 263 Ala. 297, 82 So.2d 335, the court reiterated the above doctrine.

Thus the doctrine of our cases is in accord with that of a majority of our sister states that despite an allegation in a special appearance that it is for the sole purpose of questioning the jurisdiction of the court, if matters going beyond the question of jurisdiction of the person are set forth, then the appearance is deemed general, and defects in the service are to be deemed waived.

We deem the lower court's conclusions correct, that The Times, by questioning the jurisdiction of the lower court over the subject matter of this suit, made a general appearance, and thereby submitted itself to the jurisdiction of the lower court.

Appellant's assignment No. 9 is to the effect that the lower court erred in overruling defendant's demurrers as last amended to plaintiff's complaint.

The defendant's demurrers contain a large number of grounds, and the argument of the appellant is directed toward the propositions that:

"1. As a matter of law, the advertisement was not published of and concerning the plaintiff, as appears in the face of the complaint.

"2. The publication was not libelous per se.

"3. The complaint was defective in failing to allege special damages.

"4. The complaint was defective in failing to allege facts or innuendo showing how plaintiff claimed the article had defamed him.

"5. The complaint was bad because it stated two causes of action."

Both counts of the complaint aver among other things that " * * * defendants falsely and maliciously published in the City of New York, State of New York, and in the City of Montgomery, Alabama, and throughout the State of Alabama, of and concerning the plaintiff, in a paper entitled The New York Times, in the issue of March 29, 1960, on page 25, in an advertisement entitled 'Heed Their Rising Voices' (a copy of said advertisement being attached hereto and made a part hereof as Exhibit 'A'), false and defamatory matter or charges reflecting upon the conduct of the plaintiff as a member of the Board of Commissioners of the City of Montgomery, Alabama, and imputing improper conduct to him, and subjecting him to public contempt, ridicule and shame, and prejudicing the plaintiff in his office, profession, trade or business, with an intent to defame the plaintiff, and particularly the following false and defamatory matter contained therein:

" 'In Montgomery, Alabama, after students sang "My Country 'Tis of Thee" on the State Capitol steps, their leaders were expelled from school, and truckloads of police armed with shotguns and tear-gas ringed the Alabama State College Campus. When the entire student body protested to state authorities by refusing to re-register, their dining hall was padlocked in an attempt to starve them into submission.

\* \* \* \* \* \*

" 'Again and again the Southern violators have answered Dr. King's peaceful protests with intimidation and violence. They have bombed his home almost killing his wife and child. They have assaulted his person. They have arrested him seven times—for "speeding," "loitering," and similar "offenses." And now they have charged him with "perjury"—a *felony* under which they could imprison him for *ten years.*' "

Where the words published tend to injure a person libeled by them in his reputation, profession, trade or business, or charge him with an indictable offense, or tends to bring the individual into public contempt are libelous per se. White v. Birmingham Post Co., 233 Ala. 547, 172 So. 649; Iron Age Pub. Co. v. Crudup, 85 Ala. 519, 5 So. 332

Further, "the publication is not to be measured by its effects when subjected to the critical analysis of a trained legal mind, but must be construed and determined by its natural and probable effect upon the mind of the average lay reader." White v. Birmingham Post Co., supra.

We hold that the matter complained of is, under the above doctrine, libelous per se, if it was published of and concerning the plaintiff.

In "Dangerous Words—A Guide to the Law of Libel," by Philip Wittenberg, we find the following observations, at pages 227 and 228:

"There are groupings which may be finite enough so that a description of the body is a description of the members. Here the problem is merely one of evaluation. Is the description of the member implicit in the description of the body, or is there a possibility

that a description of the body may consist of a variety of persons, those included within the charge, and those excluded from it?

\* \* \* \* \* \*

"The groupings in society today are innumerable and varied. Chances of recovery for libel of the members of such groups diminish with increasing size, and increase as the class or group decreases. Whenever a class decreases so that the individuals become obvious, they may recover for a libel descriptive of the group. In cases where the group is such that it is definite in number; where its composition is easily recognizable and the forms of its organization are apparent, then recognition of individuals libeled by group defamation becomes clear."

The same principle is aptly stated in Gross v. Cantor, 270 N.Y. 93, 200 N.E. 592, as follows:

"An action for defamation lies only in case the defendant has published the matter 'of and concerning the plaintiff.' \* \* \* Consequently an impersonal reproach of an indeterminate class is not actionable. \* \* \* 'But if the words may by any reasonable application, import a charge against several individuals, under some general description or general name, the plaintiff has the right to go on to trial, and it is for the jury to decide, whether the charge has the personal application averred by the plaintiff.'

"We cannot go beyond the face of this complaint. It does not there appear that the publication was so scattered a generality or described so large a class as such that no one could have been personally injured by it. Perhaps the plaintiff will be able to satisfy a jury of the reality of his position that the article was directed at him as an individual and did not miss the mark."

And in Wofford v. Meeks, 129 Ala. 349, 30 So. 625, we find this court saying:

"Mr. Freeman, in his note to case of Jones v. State, (Tex.Cr.App.) 43 S.W. 78, 70 Am.St.Rep. 756, after reviewing the cases, says: 'We apprehend the true rule is that, although the libelous publication is directed against a particular class of persons or a group, yet any one of that class or group may maintain an action, upon showing that the words apply especially to him.' And, further, he cites the cases approvingly which hold that each of the persons composing the class may maintain the action. We think this the correct doctrine, and it is certainly supported by the great weight of authority. 13 Am. & Eng.Enc.Law, 392, and note 1; Hardy v. Williamson, 86 Ga. 551, 12 S.E. 874, 22 Am.St.Rep. 479."

We judicially know that the City of Montgomery operates under a commission form of government. (See Act 20, Gen.Acts of Alabama 1931, page 30.) We further judicially know that under the provisions of Sec. 51, Tit. 37, Code of Alabama 1940, that under this form of municipal government the executive and administrative powers are distributed into departments of (1) public health and public safety, (2) streets, parks and public property and improvements, and, (3) accounts, finances, and public affairs; and that the assignments of the commissioners may be changed at any time by a majority of the board.

The appellant contends that the word "police" encompasses too broad a group to permit the conclusion that the statement in the advertisement was of and concerning the plaintiff since he was not mentioned by name.

We think it common knowledge that the average person knows that municipal agents, such as police and firemen, and others, are under the control and direction of the city governing body, and more particularly under the direction and control of a single commissioner. In measuring

the performance or deficiencies of such groups, praise or criticism is usually attached to the official in complete control of the body. Such common knowledge and belief has its origin in established legal patterns as illustrated by Sec. 51, supra.

In De Hoyos v. Thornton, 259 App.Div. 1, 18 N.Y.S.2d 121, a resident of Monticello, New York, a town of 4000 population, had published in a local newspaper an article in which she stated that a proposed acquisition of certain property by the municipality was "another scheme to bleed the taxpayers and force more families to lose their homes. * * * It seems to me it might be better to relieve the tension on the taxpayers right now and get ready for the golden age * * * and not be dictated to by gangsters and Chambers of Commerce."

The mayor and the three trustees of Monticello brought libel actions. The court originally considering the complaint dismissed the actions on the grounds that the plaintiffs were not mentioned in the article, and their connection with the municipality was not stated in the complaint. In reversing this decision the Appellate Division of the Supreme Court wrote: "There is no room for doubt as to who were the objects of her attack. Their identity is as clear to local readers from the article itself as if they were mentioned by name."

■ The court did not err in overruling the demurrer in the aspect that the libelous matter was not of and concerning the plaintiffs.

■ The advertisement being libelous per se, it was not necessary to allege special damages in the complaint. Iron Age Pub. Co. v. Crudup, 85 Ala. 519, 5 So. 332.

■ Where, as in this case, the matter published is libelous per se, then the complaint may be very simple and brief (Penry v. Dozier, 161 Ala. 292, 49 So. 909), and there is no need to set forth innuendo. White v. Birmingham Post Co., 233 Ala. 547, 172 So. 649. Further, a complaint in all respects similar to the present was considered sufficient in our recent case of Johnson Publishing Co. v. Davis, 271 Ala. 474, 124 So.2d 441.

The Johnson case, supra, is also to the effect that where a newspaper publishes a libel in New York, and by distribution of the paper further publishes the libel in Alabama, a cause of action arises in Alabama, as well as in New York, and that the doctrine of Age-Herald Pub. Co. v. Huddleston, 207 Ala. 40, 92 So. 193, 37 A.L.R. 898, concerned venue, and venue statutes do not apply to a foreign corporation not qualified to do business in Alabama.

In view of the principles above set forth, we hold that the lower court did not err in overruling the demurrer to the complaint in the aspects contended for and argued in appellant's brief.

Assignments of error Nos. 14, 15, 16 and 17, relate to the court's refusal to permit certain questions to be put to the venire in qualifying the jurors.

The appellant contends that The Times was unlawfully deprived of its right to question the jury venire to ascertain the existence of bias or prejudice. The trial court refused to allow four questions which were in effect, (1) Do you have any conviction, opinion or pre-disposition which would compel you to render a verdict against The Times? (2) Have any of you been plaintiffs in litigation in this court? (3) If there is no evidence of malice, would you refuse to punish The Times? (4) Is there any reason which would cause you to hesitate to return a verdict in favor of The Times?

The prospective jurors had already indicated that they were unacquainted with any of the facts in the case, that they had not discussed the case with anyone nor had it been discussed in their presence nor were they familiar in any manner with the contentions of the parties. Appellant was permitted to propound at some length other

**676**

questions designed to determine whether there was any opinion or pre-disposition which would influence the juror's judgment. The jurors indicated that there was no reason whatsoever which would cause them to hesitate to return a verdict for The Times.

▉ Sec. 52, Tit. 30, Code of Alabama 1940, gives the parties a broad right to interrogate jurors as to interest or bias. This right is limited by propriety and pertinence. It is exercised within the sound discretion of the trial court. We cannot say that this discretion has been abused where similar questions have already been answered by the prospective jurors. Dyer v. State, 241 Ala. 679, 4 So.2d 311.

▉ the second question could have conceivably revealed anything which was not already brought out by appellant's interrogation of the prospective jurors. Considering the completeness of the qualification and the remoteness of the second question, the exclusion of that inquiry by the trial court will not be regarded as an abuse of discretion. Noah v. State, 38 Ala. App. 531, 89 So.2d 231.

Appellant contends that without the right to adequately question the prospective jurors, a defendant cannot adequately ensure that his case is being tried before a jury which meets the federal constitutional standards laid down in such decisions as Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed. 751. It is sufficient to say that the jurors who tried this case were asked repeatedly, and in various forms, by counsel for The Times about their impartiality in every reasonable manner.

Appellant's assignment of error 306 pertains to the refusal of requested charge T. 22, which was affirmative in nature.

It is appellant's contention that refusal of said charge contravenes Amendment One of the United States Constitution and results in an improper restraint of freedom of the press, and further, that refusal of said charge is violative of the Fourteenth Amendment of the federal constitution.

In argument in support of this assignment, counsel for appellant asserts that the advertisement was only an appeal for support of King and "thousands of Southern Negro students" said to be "engaged in widespread non-violent demonstrations in positive affirmation of the right to live in human dignity as guaranteed by the U. S. Constitution and the Bill of Rights."

The fallacy of such argument is that it overlooks the libelous portions of the advertisement which are the very crux of this suit.

▉ The First Amendment of the U. S. Constitution does not protect libelous publications. Near v. Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357; Konigsberg v. State Bar of California, 366 U.S. 36, 81 S.Ct. 997, 6 L.Ed.2d 105; Times Film Corporation v. City of Chicago, 365 U.S. 43, 81 S.Ct. 391, 5 L.Ed.2d 403; Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031; Beauharnais v. Illinois, 343 U.S. 250, 72 S.Ct. 725, 96 L.Ed. 919.

▉ The Fourteenth Amendment is directed against State action and not private action. Collins v. Hardyman, 341 U.S. 651, 71 S.Ct. 937, 95 L.Ed. 1253.

Assignment of error No. 306 is without merit.

Appellant's assignment of error No. 94 also pertains to the court's refusal of its requested charge T. 22.

Appellant's argument under this assignment asserts it was entitled to have charge T. 22 given because of the plaintiff's failure to plead or prove special damages.

▉ In libel action, where the words are actionable per se, the complaint need not specify damages (Johnson v. Robertson, 8 Port. 486), nor is proof of pecuniary injury required, such injury being implied. Johnson Publishing Co. v. Davis, supra.

▉ Assignments 18, 19, 21, 23, 25, 27, 30, and 32, relate to the action of the court

in overruling defendant's objections to questions propounded to six witnesses presented by the plaintiff as to whether they associated the statements in the advertisement with the plaintiff. All of the witnesses answered such questions in such manner as to indicate that they did so associate the advertisement.

Without such evidence the plaintiff's cause would of necessity fall, for that the libel was of or concerning the plaintiff is the essence of plaintiff's claim.

Section 910 of Title 7, Code of Alabama 1940, pertaining to libel, among other things, provides that " * * * and if the allegation be denied, the plaintiff must prove, on the trial, the facts showing that the defamatory matter was published or spoken of him." This statute would seem to require the proof here admitted. And in Wofford v. Meeks, 129 Ala. 349, 30 So. 625, 55 L.R.A. 214, the court stated that where the libel is against a group, any one of that group may maintain an action "upon showing that the words apply specially to him," and in Chandler v. Birmingham News Co., 209 Ala. 208, 95 So. 886, this court said, "Any evidence which tended to show it was not intended 'of and concerning him' was material and relevant to the issue."

In Hope v. Hearst Consolidated Publications, (2 Cir.1961), 294 F.2d 681, the court said as to the admissibility of testimony that a witness believed the defamatory matter referred to the plaintiff:

"In this regard it appears that the New York exclusionary rule represents a distinct, if not a lone, minority voice. The vast majority of reported cases, from both American state and British courts, espouse the admission of such evidence; the text writers similarly advocate its admissibility.

* * * * * *

"The plaintiff, as a necessary element in obtaining relief, would have to prove that the coercive lies were understood, by customers, to be aimed in his direction. In a case where the plaintiff was not specifically named, the exact issue now before us would be presented."

In accord with the doctrine that the instant evidence was admissible may be cited, among other authorities Marr v. Putnam Oil Co., 196 Or. 1, 246 P.2d 509; Red River Valley Pub. Co., Inc. v. Bridges, (Tex. Civ.App.) 254 S.W.2d 854; Colbert v. Journal Pub. Co., 19 N.M. 156, 142 P. 146; Prosser v. Callis et al., 117 Ind. 105, 19 N.E. 735; Martin County Bank v. Day, 73 Minn. 195, 75 N.W. 1115; Ball v. Evening American Pub. Co., 237 Ill. 592, 86 N.E. 1097; Children v. Shinn, 168 Iowa 531, 150 N.W. 864.

■ Appellant's assignments of error 22, 26, 28, 31, 33, and 34, relate to the action of the court in overruling objections to certain questions propounded to plaintiff's witnesses Blackwell, Kaminsky, Price, Parker, and White, which questions were to the effect that if the witnesses believed the matter contained in the advertisement, would they have thought less of the plaintiff.

Counsel for appellant argues that the questions " * * * inescapably carried the implication that the witness thought the ad was published of and concerning the plaintiff." Each and every one of the above named witnesses had testified previous to the instant questions, that they had associated the City Commissioners, or the plaintiff, with the advertisement upon reading it. The questions were therefore based upon the witnesses' testimony that they associated the advertisement with the plaintiff, and not merely an implication that might be read into the question.

Counsel further argues that the question is hypothetical in that none of the witnesses testified they believed the advertisement, or that they thought less of the plaintiff.

While we think such evidence of small probative value, yet it would have rele-

vancy not only as to its effect upon the recipient, but also as to the effect such publication may reasonably have had upon other recipients. See "Defamation," 69 Harv.L.R., 877, at 884.

 This aside, we cannot see that the answers elicited were probably injurious to the substantial rights of the appellant. Sup. Court Rule 45. Proof of common knowledge is without injury, though it be unnecessary to offer such proof.

 Clearly we think it common knowledge that publication of matter libelous per se would, if believed, lessen the person concerned in the eyes of any recipient of the libel. See Tidmore v. Mills, 33 Ala. App. 243, 32 So.2d 769, and cases cited therein.

 Assignment of error No. 63 asserts error arising out of the following instance during the cross-examination of Gershon Aronson, a witness for The Times, which matter, as shown by the record, had been preceded by numerous objections, and considerable colloquy between counsel and court:

"Q Would you state now sir, what that word means to you; whether it has only a time meaning or whether it also to your eye and mind has a cause and effect meaning?

"MR. EMBRY: Now, we object to that, Your Honor. That's a question for the jury to determine—

"THE COURT: Well, of course, it probably will be a question for the jury, but this gentleman here is a very high official of The Times and I should think he can testify—

"MR. DALY: I object to that, Your Honor. He isn't a high official of The Times at all—

"MR. EMBRY: He is just a man that has a routine job there, Your Honor. He is not—

"THE COURT: Let me give you an exception to the Court's ruling.

"MR. EMBRY: We except."

We do not think it can be fairly said that the record discloses a ruling by the trial court on counsel's objection to the use of the term "very high official." The ruling made by the court is palpably to the question to which the objection was interposed. Counsel interrupted the court to object to the term "very high official," and second counsel added, "He is just a man that has a routine job there, Your Honor." Apparently this explanation satisfied counsel, as the court's use of the term was not pursued to the extent of obtaining a ruling upon this aspect, and the court's ruling was upon the first, and main objection.

Mr. Aronson testified that he had been with The Times for twenty-five years, and was Assistant Manager of the Advertising Acceptability Department of The Times, and was familiar with the company's policies regarding advertising in all its aspects, that is, sales, acceptability, etc., and that advertisements of organizations and committees that express a point of view comes within the witness's particular duties.

In view of the above background of Mr. Aronson, and the state of the record immediately above referred to, we are unwilling to cast error upon the lower court in the instance brought forth under assignment No. 63.

Assignment of error No. 81 is to the effect that the lower court erred in denying appellant's motion for a new trial. Such an assignment is an indirect assignment of all of the grounds of the motion for a new trial which appellant sees fit to bring forward and specify as error in his brief.

The appellant under this assignment has sought to argue several grounds of its motion for a new trial.

Counsel, in this connection, seeks to cast error on the lower court because of an alleged prejudicial statement made by coun-

sel for the appellee in his argument to the jury.

The record fails to show any objections were interposed to any argument by counsel for any of the litigants during the trial. There is therefore nothing presented to us for review in this regard. Woodward Iron Co. v. Earley, 247 Ala. 556, 25 So.2d 267, and cases therein cited.

Counsel also argues two additional grounds contained in the motion for a new trial, (1) that the appellant was deprived of due process in the trial below because of hostile articles in Montgomery newspapers, and (2) because of the presence of photographers in the courtroom and the publication of the names and pictures of the jury prior to the rendition of the verdict.

As to the first point, the appellant sought to introduce in the hearing on the motion for a new trial newspaper articles dated prior to, and during, the trial. The court refused to admit these articles.

At no time during the course of the trial below did the appellant suggest a continuance, or a change of venue, or that it did not have knowledge of said articles.

Likewise, at no time was any objection interposed to the presence of photographers in the courtroom.

Newly discovered evidence was not the basis of the motion for a new trial. This being so, the court was confined upon the hearing on the motion to matters contained in the record of the trial. Thomason v. Silvey, 123 Ala. 694, 26 So. 644; Alabama Gas Co. v. Jones, 244 Ala. 413, 13 So.2d 873.

Assignment of error 78 pertains to an alleged error occurring in the court's oral charge.

In this connection the record shows the following:

"MR. EMBRY: We except, your Honor. We except to the oral portions of Your Honor's Charge wherein Your Honor charged on libel per se. We object to that portion of Your Honor's Charge wherein Your Honor charged as follows: 'So, as I said, if you are reasonably satisfied from the evidence before you, considered in connection with the rules of law the Court has stated to you, you would come to consider the question of damages and, where as here, the Court has ruled the matter complained of proved to your reasonable satisfaction and aimed at the plaintiff in this case, is libelous per se then punitive damages may be awarded by the jury even though the amount of actual damages is neither found nor shown.'

"THE COURT: Overruled and you have an exception."

Preceding the above exception the court had instructed the jury as follows:

"Now, as stated, the defendants say that the ad complained of does not name the plaintiff, Sullivan, by name and that the ad is not published of and concerning him. * * * The plaintiff, Sullivan, as a member of the group referred to must show by the evidence to your reasonable satisfaction that the words objected to were spoken of and concerning him. The reason for this being that while any one of a class or group may maintain an action because of alleged libelous words, he must show to the reasonable satisfaction of the jury that the words he complained of apply especially to him or are published of and concerning him.

* * * * * *

"So, at the very outset of your deliberations you come to this question: Were the words complained of in counts 1 and 2 of this complaint spoken of and concerning the plaintiff, Sullivan? That's the burden he has. He must show that to your reasonable satisfaction and if the evidence in this case does not reasonably satisfy you that

the words published were spoken of or concerning Sullivan or that they related to him, why then of course he would not be entitled to any damages and you would not go any further."

In addition the court gave some eleven written charges at defendant's request, instructing the jury in substance that the burden was upon the plaintiff to establish to the reasonable satisfaction of the jury that the advertisement in question was of and concerning the plaintiff, and that without such proof the plaintiff could not recover.

It is to be noted that in the portion of the complained of instructions excerpted above, the court first cautioned the jury they were to consider the evidence in connection with the rules of law stated to them. The court had previously made it crystal clear that the jury were to determine to their reasonable satisfaction from the evidence that the words were spoken of and concerning the plaintiff.

Counsel for appellant contend that because of the words "and aimed at the plaintiff in this case," the instruction would be taken by the jury as a charge that the advertisement was of and concerning the plaintiff, and hence the instruction was invasive of the province of the jury.

Removed from the full context of the court's instructions the charge complained of, because of its inept mode of expression, might be criticized as confused and misleading.

■ However, it is basic that a court's oral charge must be considered as a whole and the part excepted to should be considered in the light of the entire instruction. If as a whole the instructions state the law correctly, there is no reversible error even though a part of the instructions, if considered alone, might be erroneous.

Innumerable authorities enunciating the above doctrines may be found in 18 Ala.Dig. Trial ☜295(1) through 295(11).

Specifically, in reference to portions of oral instructions that might be criticized because tending to be invasive of the province of the jury, we find the following stated in 89 C.J.S. Trial § 438, the text being amply supported by citations:

"A charge which, taken as a whole, correctly submits the issues to the jury will not be held objectionable because certain instructions, taken in their severalty, may be subject to criticism on the ground they invade the province of the jury, * * *."

To this same effect, see Abercrombie v. Martin and Hoyt Co., 227 Ala. 510, 150 So. 497; Choctaw Coal and Mining Co. v. Dodd, 201 Ala. 622, 79 So. 54.

■ We have carefully read the court's entire oral instruction to the jury. It is a fair, accurate, and clear expression of the governing legal principles. In light of the entire charge we consider that the portion of the charge complained of to be inconsequential, and unlikely to have affected the jury's conclusions. We do not consider it probable that this appellant was injured in any substantial right by this alleged misleading instruction in view of the court's repeated and clear exposition of the principles involved, and the numerous written charges given at defendant's request further correctly instructing the jury in the premises.

The individual appellants, Ralph D. Abernathy, Fred L. Shuttlesworth, S. S. Seay, Sr., and J. E. Lowery have also filed briefs and arguments in their respective appeals. Many of the assignments of error in these individual appeals are governed by our discussion of the principles relating to the appeal of The Times. We therefore will now confine our review in the individual appeals to those assignments that may present questions not already covered.

■ In their assignment of error No. 41, the individual appellants assert that the lower court erred in it oral instructions as

to ratification of the use of their names in the publication of the advertisement. The instructions of the court in this regard run for a half a page or better. The record shows that an exception was attempted in the following language:

"Lawyer Gray: Your Honor, we except to the Court's charge dealing with ratification as well as the Court's charge in connection with the advertisement being libelous per se in behalf of each of the individual defendants."

The above attempted exception was descriptive of the subject matter only, and is too indefinite to invite our review. ·Birmingham Ry. Light and Power Co. v. Friedman, 187 Ala. 562, 65 So. 939; Conway v. Robinson, 216 Ala. 495, 113 So. 531; Birmingham Ry. Light and Power Co. v. Jackson, 198 Ala. 378, 73 So. 627.

The refusal of a large number of charges applicable only to the individual appellants are also made the bases of numerous assignments of error. We have ·read all such refused charges, and each and every one is faulty.

■■■ Several of the charges instruct the jury that if the jury "find" etc., while others use the term "find from the evidence." These charges were refused without error in that the predicate for the jury's determination in a civil suit is "reasonably satisfied from the evidence." A court cannot be reversed for its refusal of charges which are not expressed in the exact and appropriate terms of the law. W. P. Brown and Sons Lumber Co. v. Rattray, 238 Ala. 406, 192 So. 851, 129 A.L.R. 526.

■■ Others of the refused charges, not affirmative in nature, are posited on "belief," or "belief from the evidence." A judgment will not be reversed or affirmed because of the refusal, or giving, of "belief" charges. Sovereign Camp, W. O. W. v. Sirten, 234 Ala. 421, 175 So. 539; Pan American Petroleum Co. v. Byars, 228 Ala. 372, 153 So. 616; Casino Restaurant

v. McWhorter, 35 Ala.App. 332, 46 So.2d 582.

■■ Specification of error number 6 asserts error in the court's action in refusing to sustain the individual defendants' objection to the way one of the plaintiff's counsel pronounced the word "negro." When this objection was interposed, the court instructed plaintiff's counsel to "read it just like it is," and counsel replied, "I have been pronouncing it that way all my life." The court then instructed counsel to proceed. No further objections were interposed, nor exceptions reserved.

We consider this assignment mere quibbling, and certainly nothing is presented for our review in the state of the record.

■■ Counsel have also argued assignments to the effect that error infects this record because, (1) the courtroom was segregated during the trial below, and (2) the trial judge was not duly and legally elected because of alleged deprivation of voting rights to negroes.

Neither of the above matters were presented in the trial below, and cannot now be presented for review.

■■ Counsel further argues that the appellants were deprived of a fair trial in that the trial judge was, by virtue of Local Act No. 118, 1939 Local Acts of Alabama, p. 66, a member of the jury commission of Montgomery County. This act is constitutional. Reeves v. State, 260 Ala. 66, 68 So.2d 14.

Without intimating that any merit attaches to this contention, it is sufficient to point out that this point was not raised in the trial below, and must be considered as having been waived. De Moville v. Merchants & Farmers Bank of Greene County, 237 Ala. 347, 186 So. 704.

Assignments 42, 121, 122, . assert error in the court's refusal to hear the individual appellants' motions for new trials, and reference in brief is made to pages 2058–2105 of the record in this connection.

These pages of the record merely show that the individual appellants filed and presented to the court their respective motions for a new trial on 2 December 1960, and the same were continued until 16 December 1960. On 16 December 1960, the respective motions were continued to 14 January 1961. No further orders in reference to the motions of the individual appellants appear in the record, and no judgment on any of the motions of the individual appellants appears in the record.

The motions of the individual appellants therefore became discontinued after 14 January 1961.

■■■ There being no judgments on the motion for a new trial of the individual appellants, and they having become discontinued, those assignments by the individual appellants attempting to raise questions as to the weight of the evidence, and the excessiveness of the damages are ineffective and present nothing for review. Such matters can be presented only by a motion for a new trial. See 2 Ala.Dig. Appeal and Error ☞294(1) and 295, for innumerable authorities.

Other matters are argued in the briefs of the individual appellants. We conclude they are without merit and do not invite discussion, though we observe that some of the matters attempted to be brought forward are insufficiently presented to warrant review.

### Evidence on the Merits

The plaintiff first introduced the depositional testimony of Harding Bancroft, secretary of The Times.

Mr. Bancroft thus testified that one John Murray brought the original of the advertisement to The Times where it was delivered to Gershon Aronson, an employee of The Times. A Thermo-fax copy of the advertisement was turned over to Vincent Redding, manager of the advertising department, and Redding approved it for insertion in The Times. The actual insertion was done pursuant to an advertising insertion order issued by the Union Advertising Service of New York City.

Redding determined that the advertisement was endorsed by a large number of people whose reputation for truth he considered good.

Numerous news stories from its correspondents, published in The Times, relating to certain events which formed the basis of the advertisement and which had been published from time to time in The Times were identified. These news stories were later introduced in evidence as exhibits.

Also introduced through this witness was a letter from A. Philip Randolph certifying that the four individual defendants had all given permission to use their names in furthering the work of the "Committee to Defend Martin Luther King and the Struggle for Freedom in the South."

Mr. Bancroft further testified that The Times received a letter from the plaintiff dated 7 April 1960, demanding a retraction of the advertisement. They replied by letter dated 15 April 1960, in which they asked Mr. Sullivan what statements in the advertisement reflected on him.

After the receipt of the letter from the plaintiff, The Times had McKee, its "string" correspondent in Montgomery, and Sitton, its staff correspondent in Atlanta, investigate the truthfulness of the allegations in the advertisement. Their lengthy telegraphic reports, introduced in evidence showed that the Alabama College officials had informed them that the statement that the dining room at the College had been padlocked to starve the students into submission was absolutely false; that all but 28 of the 1900 students had re-registered and meal service was furnished all students on the campus and was available even to those who had not registered, upon payment for the meals; that the Montgomery police entered the campus upon request of the College officials, and then only after a mob

of rowdy students had threatened the negro college custodian, and after a college policeman had fired his pistol in the air several times in an effort to control the mob. The city police had merely tried to see that the orders of the Alabama College officials were not violated.

Sitton's report contained the following pertinent statements:

"* * * Paragraph 3 of the advertisement, which begins, 'In Montgomery, Alabama, after students sang' and so forth, appears to be virtually without any foundation. The students sang the National Anthem. Never at any time did police 'ring' the campus although on three occasions they were deployed near the campus in large numbers. Probably a majority of the student body was at one time or another involved in the protest but not the 'entire student body.' I have been unable to find any one who has heard that the campus dining room was padlocked. * * * In reference to the 6th paragraph, beginning: 'Again and again the Southern violators' and so forth, Dr. King's home was bombed during the bus boycott some four years ago. His wife and child were there but were not (repeat not) injured in any way. King says that the only assault against his person took place when he was arrested some four years ago for loitering outside a courtroom. The arresting officer twisted King's arm behind the minister's back in taking him to be booked. * * *.'"

These reports further show that King had been arrested only twice by the Montgomery police. Once for speeding on which charge he was convicted and paid a $10.00 fine, and once for "loitering" on which charge he was convicted and fined $14.00, this fine being paid by the then police commissioner whom the plaintiff succeeded in office.

Mr. Bancroft further testified that upon receipt of a letter from John Patterson, Governor of Alabama, The Times retracted the advertisement as to Patterson, although in The Times' judgment no statement in the advertisement referred to John Patterson either personally or as Governor of Alabama. However, The Times felt that since Patterson held the high office of Governor of Alabama and believed that he had been libeled, they should apologize.

Grover C. Hall, Jr., Arnold D. Blackwell, William H. MacDonald, Harry W. Kaminsky, H. M. Price, Sr., William M. Parker, Jr., and Horace W. White, all residents of the city of Montgomery, as well as the plaintiff, testified over the defendant's objections that upon reading the advertisement they associated it with the plaintiff, who was Police Commissioner.

E. Y. Lacy, Lieutenant of detectives for the city of Montgomery, testified that he had investigated the bombings of King's home in 1955. This was before the plaintiff assumed office as Commissioner of Police. One bomb failed to explode, and was dismantled by Lacy. In attempting to apprehend the bombers, "The Police Department did extensive research work with overtime and extra personnel and we did everything that we knew including inviting and working with other departments throughout the country."

O. M. Strickland, a police officer of the city of Montgomery, testified that he had arrested King on the loitering charge after King had attempted to force his way into an already overcrowded courtroom, Strickland having been instructed not to admit any additional persons to the courtroom unless they had been subpoenaed as a witness. At no time did he nor anyone else assault King in any manner, and King was permitted to make his own bond and was released.

In his own behalf the plaintiff, Sullivan, testified that he first read the advertisement in the Mayor's office in Montgomery. He testified that he took office as a Commissioner of the City of Montgomery in October 1959, and had occupied that posi-

tion since. Mr. Sullivan testified that upon reading the advertisement he associated it with himself, and in response to a question on cross-examination, stated that he felt that he had been greatly injured by it.

Mr. Sullivan gave further testimony as to the falsity of the assertions contained in the advertisement.

For the defense, Gershon Aronson, testified that the advertisement was brought to him by John Murray and he only scanned it hurriedly before the advertisement was sent to the Advertising Acceptability Department of The New York Times. As to whether the word "they" as used in the paragraph of the advertisement charging that "Southern violators" had bombed King's home, assaulted his person, arrested him seven times, etc., referred to the same people as "they" in the paragraph wherein it was alleged that the Alabama College students were padlocked out of their dining room in an attempt to starve them into submission and that the campus was ringed with police, armed with shotguns, tear gas, etc., Aronson first stated, "Well, it may have referred to the same people. It is rather difficult to tell" and a short while later Aronson stated, "Well, I think now it probably refers to the same people."

The Times was paid in the vicinity of $4,800 for publishing the advertisement.

D. Vincent Redding, assistant to the manager of the Advertising Acceptability Department of The Times, testified that he examined the advertisement and approved it, seeing nothing in it to cause him to believe it was false, and further he placed reliance upon the endorsers "whose reputations I had no reason to question." On cross-examination Mr. Redding testified he had not checked with any of the endorsers as to their familiarity with the events in Montgomery to determine the accuracy of their statements, nor could he say whether he had read any news accounts concerning such events which had been published in

The Times. The following is an excerpt from Mr. Redding's cross-examination:

"Q Now, Mr. Redding, wouldn't it be a fair statement to say that you really didn't check this ad at all for accuracy?

"A That's a fair statement, yes."

Mr. Harding Bancroft, Secretary of The Times, whose testimony taken by deposition had been introduced by the plaintiff, testified in the trial below as a witness for the defendants. His testimony is substantially in accord with that given in his deposition and we see no purpose in an additional delineation of it.

As a witness for the defense, John Murray testified that he was a writer living in New York City. He was a volunteer worker for the "Committee to Defend Martin Luther King," etc., and as such was called upon, together with two other writers, to draft the advertisement in question.

These three were given material by Bayard Rustin, the Executive Director of the Committee, as a basis for composing the advertisement. Murray stated that Rustin is a professional organizer, he guessed along the line of raising funds. Murray knew that Rustin had been affiliated with the War Resisters League, among others.

After the first proof of the advertisement was ready, Rustin called him to his office and stated he was dissatisfied with it as it did not have the kind of appeal it should have if it was to get the response in funds the Committee needed.

Rustin then stated they could add the names of the individual defendants since by virtue of their membership in the Southern Christian Leadership Conference, which supported the work of the Committee, he felt they need not consult them.

The individual defendants' names were then placed on the advertisement under the legend "We in the South who are struggling daily for dignity and freedom warmly endorse this appeal."

Murray further testified that he and Rustin rewrote the advertisement "to get money" and "to project the ad in the most appealing form from the material we were getting."

As to the accuracy of the advertisement, Murray testified:

"Well, that did not enter the—it did not enter into consideration at all except we took it for granted that it was accurate—we took it for granted that it was accurate—they were accurate—and if they hadn't been—I mean we would have stopped to question it—I mean we would have stopped to question it. We had every reason to believe it."

The individual defendants all testified to the effect that they had not authorized The New York Times, Philip Randolph, the "Committee to Defend Martin Luther King," etc., nor any other person to place their names on the advertisement, and in fact did not see the contents of the advertisement until receipt of the letter from the plaintiff.

They all testified that after receiving the letter demanding a retraction of the advertisement they had not replied thereto, nor had they contacted any person or group concerning the advertisement or its retraction.

### Amount of Damages

■■■ Under assignment of error No. 81, The Times argues those grounds of its motion for a new trial asserting that the damages awarded the plaintiff are excessive, and the result of bias, passion, and prejudice.

In Johnson Publishing Co. v. Davis, supra, Justice Stakely in a rather definitive discussion of a court's approach to the question of the amount of damages awarded in libel actions made the following observations:

"* * * The punishment by way of damages is intended not alone to punish the wrongdoer, but as a deterrent to others similarly minded. Liberty National Life Insurance Co. v. Weldon, supra; Advertiser Co. v. Jones, supra [267 Ala. 171, 100 So.2d 696, 61 A.L.R.2d 1346]; Webb v. Gray, 181 Ala. 408, 62 So. 194.

"Where words are libelous per se and as heretofore stated we think the published words in the present case were libelous per se, the right to damages results as a consequence, because there is a tendency of such libel to injure the person libeled in his reputation, profession, trade or business, and proof of such pecuniary injury is not required, such injury being implied. Advertiser Co. v. Jones, supra [169 Ala. 196, 53 So. 759]; Webb v. Gray, supra; Brown v. Publishers: George Knapp & Co., 213 Mo. 655, 112 S.W. 474; Maytag Co. v. Meadows Mfg. Co., 7 Cir., 45 F.2d 299.

"Because damages are presumed from the circulation of a publication which is libelous per se, it is not necessary that there be any correlation between the actual and punitive damages. Advertiser Co. v. Jones, supra; Webb v. Gray, supra; Whitcomb v. Hearst Corp., 329 Mass. 193, 107 N.E.2d 295.

"The extent of the circulation of the libel is a proper matter for consideration by the jury in assessing plaintiff's damages. Foerster v. Ridder, Sup., 57 N.Y.S.2d 668; Whitcomb v. Hearst Corp., supra.

\* \* \* \* \* \*

"In Webb v. Gray, supra [181 Ala. 408, 62 So. 196], this court made it clear that a different rule for damages is applicable in libel than in malicious prosecution cases and other ordinary tort cases. In this case the court stated in effect that in libel cases actual damages are presumed if the statement is libel-

ous per se and accordingly no actual damages need be proved.

\* \* \* \* \* \*

"In Advertiser Co. v. Jones, supra, this Court considered in a libel case the claim that the damages were excessive and stated: 'While the damages are large in this case we cannot say that they were excessive. There was evidence from which the jury might infer malice, and upon which they might award punitive damages. This being true, neither the law nor the evidence furnishes us any standard by which we can ascertain certainly that they were excessive. The trial court heard all of this evidence, saw the witnesses, observed their expression and demeanor, and hence was in a better position to judge of the extent of punishment which the evidence warranted than we are, who must form our conclusions upon the mere narrative of the transcript. This court, in treating of excessive verdicts in cases in which punitive damages could be awarded, through Justice Haralson spoke and quoted as follows: " 'There is no legal measure of damages in cases of this character.' "

\* \* \* \* \*

"The Supreme Court of Missouri considered the question in Brown v. Publishers: George Knapp & Co., 213 Mo. 655, 112 S.W. 474, 485, and said: 'The action for libel is one to recover damages for injury to man's reputation and good name. It is not necessary, in order to recover general damages for words which are actionable per se, that the plaintiff should have suffered any actual or constructive pecuniary loss. In such action, the plaintiff is entitled to recover as general damages for the injury to his feelings which the libel of the defendant has caused and the mental anguish or suffering which he had endured as a consequence thereof. *So many considerations enter into the awarding of damages by a jury in a libel case that the courts approach the question of the excessiveness of a verdict in such case with great reluctance.* The question of damages for a tort especially in a case of libel or slander is peculiarly within the province of the jury, and unless the damages are so unconscionable as to impress the court with its injustice, and thereby to induce the court to believe the jury were actuated by prejudice, partiality, or corruption, it rarely interferes with ·the verdict.' " (Emphasis supplied.)

In the present case the evidence shows that the advertisement in question was first written by a professional organizer of drives, and rewritten, or· "revved up" to make it more "appealing." The Times in its own files had articles already published which would have demonstrated the falsity of the allegations in the advertisement. Upon demand by the Governor of Alabama, The Times published a retraction of the advertisement insofar as the Governor of Alabama was concerned. Upon receipt of the letter from the plaintiff demanding a retraction of the allegations in the advertisement, The Times had investigations made by a staff correspondent, and by its "string" correspondent. Both made a report demonstrating the falsity of the allegations. Even in the face of these reports, The Times adamantly refused to right the wrong it knew it had done the plaintiff. In the trial below none of the defendants questioned the falsity of the allegations in the advertisement.

On the other hand, during his testimony it was the contention of the Secretary of The Times that the advertisement was "substantially correct." In the face of this cavalier ignoring of the falsity of the advertisement, the jury could not have but been impressed with the bad faith of The Times, and its maliciousness inferable therefrom.

While in the Johnson Publishing Co. case, supra, the damages were reduced by

way of requiring a remittitur, such reduction was on the basis that there was some element of truth in part of the alleged libelous statement. No such reason to mitigate the damages is present in this case.

It is common knowledge that as of today the dollar is worth only 50 cents or less of its former value.

The Times retracted the advertisement as to Governor Patterson, but ignored this plaintiff's demand for retraction. The matter contained in the advertisement was equally false as to both parties.

The Times could not justify its nonretraction as to this plaintiff by fallaciously asserting that the advertisement was substantially true, and further, that the advertisement as presented to The Times bore the names of endorsers whose reputation for truth it considered good.

The irresponsibility of these endorsers in attaching their names to this false and malicious advertisement cannot shield The Times from its irresponsibility in printing the advertisement and scattering it to the four winds.

All in all we do not feel justified in mitigating the damages awarded by the jury, and approved by the trial judge below, by its judgment on the motion for a new trial, with the favorable presumption which attends the correctness of the verdict of the jury where the trial judge refuses to grant a new trial. Housing Authority of City of Decatur v. Decatur Land Co., 258 Ala. 607, 64 So.2d 594

In our considerations we have examined the case of New York Times Company v. Conner, (5CCA) 291 F.2d 492 (1961), wherein the Circuit Court of Appeals for the Fifth Circuit, relying exclusively upon Age Herald Publishing Co. v. Huddleston, 207 Ala. 40, 92 So. 193, 37 A.L.R. 898, held that no cause of action for libel arose in Alabama where the alleged libel appeared in a newspaper primarily published in New York.

This case overlooks, or ignores, the decision of this court in Johnson Publishing Co. v. Davis, 271 Ala. 474, 124 So.2d 441, wherein this court rejected the argument that the whole process of writing, editing, printing, transportation and distribution of a magazine should be regarded as one libel, and the locus of such libel was the place of primary publication. This court further, with crystal clarity, held that Age Herald Publishing Co. v. Huddleston, supra, concerned a venue statute, and that venue statutes do not apply to foreign corporations not qualified to do business in Alabama.

The statement of Alabama law in the Conner case, supra, is erroneous in light of our enunciation of what is the law of Alabama as set forth in the Johnson Publishing Company case, supra. This erroneous premise, as we interpret the Conner case, renders the opinion faulty, and of no persuasive authority in our present consideration.

"The laws of the several states, except where the Constitution or treaties of the United States or Acts of Congress otherwise require or provide, shall be regarded as rules of decision in civil actions in the courts of the United States, in cases where they apply." Sec. 1652, Title 28, U.S.C.A., 62 Stat. 944.

It is our conclusion that the judgment below is due to be affirmed, and it is so ordered.

Affirmed.

LIVINGSTON, C. J., and SIMPSON and MERRILL, JJ., concur.